2 A.3d 1138 (2010)
415 N.J. Super. 551
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
I.H.C. and D.C., Defendants-Respondents.
In the Matter of A.C., J.C., and H.C., Minor-Appellants.
No. A-2208-09T4.
Superior Court of New Jersey, Appellate Division.
Argued June 8, 2010.
Decided August 5, 2010.
*1140 Lorraine M. Augostini, Deputy Public Defender, and Christopher A. Huling, Assistant Deputy Public Defender, argued the cause for minor-appellants A.C., J.C. and H.C. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Ms. Augostini, of counsel and on the brief; Mr. Huling, on the brief).
Michael V. Calabro, Newark, argued the cause for respondent D.C.
Pasquale F. Giannetta argued the cause for respondent I.H.C. (Mr. Giannetta joins in the brief of respondent D.C.).
Andrea D'Aleo, Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (Paula T. Dow, Attorney General, attorney; Ms. D'Aleo, on the brief).
*1141 Before Judges PARRILLO, LIHOTZ and ASHRAFI.
PER CURIAM.
The Law Guardian for three children, now ages two, three, and four, appeals from the judgment of the Family Part finding insufficient evidence that defendant-parents had abused or neglected the children because of domestic violence in the home. The Division of Youth and Family Services (DYFS) joins in the appeal. We have stayed the Family Part's order to return the children to the parents pending resolution of this appeal.
Although the Family Part judge carefully and conscientiously analyzed the extensive record and made findings of fact supported by the record, we conclude that the judgment was based on an overly narrow view of the claims made by DYFS and the meaning of domestic violence in the context of abuse or neglect of children. We also conclude that evidence of prior domestic violence committed by defendant-father against his ex-wife and the two children of a prior marriage was admissible in this case to prove the risk of harm to these children. We reverse and hold that DYFS proved the need for protective services for these children within the meaning of abuse or neglect contained in N.J.S.A. 9:6-8.21c(4).

I.
Defendant-father, I.H.C., is now thirty-seven years old. He has been unemployed throughout his adult life because of medical and psychological disabilities. Defendant-mother, D.C., is now twenty-seven, and she is also unemployed because of physical and psychological conditions. In their childhood, both were victims of abuse. Neither has received adequate treatment for their serious psychological conditions. They have limited education because of their disabilities and the circumstances of their childhood. The father cannot read. The mother dropped out of high school before finishing the tenth grade.
In 2008 to early 2009, the couple lived in Hunterdon County with their three children, a boy A.C. born in December 2005, a girl J.C. born in February 2007, and a girl H.C. born in April 2008. The father was married two previous times and has other children, whom he does not see or support.
DYFS became involved with the family on December 16, 2008, through a referral alleging that the children were being strapped and confined for unusual amounts of time within the home in child booster seats and that domestic violence occurred in the home. The next day, DYFS sent two case workers to the home to investigate. The children were strapped in booster seats when the DYFS workers arrived, but they appeared healthy and unharmed. The mother explained that the children were fed in the booster seats and remained in them for a short period after a meal. She denied that any domestic violence had been committed against her. The home was clean and orderly, although it contained some unusual decorative features, such as skulls and knives. After inspecting the home and speaking with both parents, DYFS determined that the referral of abuse and neglect of the children was unfounded.
A day later, on December 18, 2008, DYFS received a second referral alleging physical abuse of the children and domestic violence. Before DYFS investigated this second referral, the family's neighbor called and said she had been handed a disturbing letter from the mother a few days earlier. DYFS retrieved the letter. It was a handwritten note, dated December 11, 2008, and was signed in the name *1142 of defendant-mother. With cross-outs omitted, it said in full:
If anything may happened to me please do an altops on me b/c My husband has done something to me. If there is drugs in my system then him or some of his friends put them there b/c I don't do drugs. Hes thrend to have me killed or kill me himself hes alread tried it a few times. Im scare to leave b/c I will be killed. Im afread that he might hurt my children if they are keeped in his care. I know that one day he will kill me and Im scared to death that he will. Im very afread of him. Im scared for my life when he's around. Hes always putting his hands on me. He's already stabed me with a screwdriver in the hand. Im afread for my life. Please do an investagtion on my death b/c I would be murdered by my husband or his friends. He teaches my son how to kill someone at the age of 3.
 Thank you[.]
DYFS collected additional information, including several police reports dated from October 2007 through May 2008 documenting calls of loud arguing in the home. The neighbor also turned over tape recordings she had made of arguments in the home in 2006 and 2007. DYFS contacted the father's former wives and received information about his relationships with them. By the time DYFS workers returned to the home to investigate the second referral on December 18, the family had left to spend the holidays in Pennsylvania. During the next several weeks, defendant-father was in contact with DYFS by telephone but refused to disclose their location.
When the family returned to New Jersey on January 9, 2009, DYFS workers went to the home immediately to investigate. They spoke to the mother alone in the home and to the father at a police station. The father denied he had committed any domestic violence against his current family or against his ex-wives and said that he was the victim of domestic violence by one of them.
The mother again denied that there was domestic violence in the home. When shown the letter provided by the neighbor, she became angry and accused the neighbor of having written it. Asked about the reference to being stabbed with a screwdriver, she said it was an accident.
A DYFS worker noticed that the bedroom windows were nailed shut. In response to additional questioning, defendant-mother said she does not go anywhere without her husband because she does not have a driver's license. Questioned about how she would seek help in the event of danger to herself or the children since her husband kept the only working cell phone in the house, she said she would charge the battery in another cell phone, and it can be used to call 911 even if it is inactive. The case worker tried to persuade the mother to leave the home with the children and go to a safe place that DYFS would provide, but she refused. Upon learning that DYFS intended to remove the children, and given another opportunity to go with them to a safe place, defendant-mother angrily asked whether she was being forced to choose between her children and her husband, and then said "take them."
DYFS removed the children from the home pursuant to N.J.S.A. 9:6-8.29 and N.J.S.A. 30:4C-12 and placed them in emergency foster care. It filed a verified complaint seeking protective custody and supervision. The return date of an order to show cause on the complaint was adjourned until February at the request of defendant-parents while they sought private counsel.
*1143 The court held a hearing pursuant to N.J.S.A. 9:6-8.31, -8.32 concerning the emergency removal of the children on February 19 and March 12, 2009. Each parent was represented by a privately retained attorney. In addition to the DYFS case worker, the neighbor and defendant-mother testified. The father attended only the March 12 session and did not testify. The main focus of the hearing was on the letter quoted previously although substantial other evidence was also presented.
The DYFS case worker testified about the reasons for and circumstances of the emergency removal of the children. The neighbor testified that she had resided in the adjoining apartment of a duplex with defendants since 2004. Defendant-mother moved in during spring 2005. They had a neighborly and mutually helpful relationship. However, on several occasions, the neighbor heard loud arguing through the common wall of their homes and became concerned. In late 2006 and early 2007, she recorded two episodes of the loud arguing. Although she did not hear what defendant-father was saying in the recorded arguments, she heard defendant-mother say "leave me alone," "get off of me," and "let me out." She also testified that often, when defendant-mother was outside the home talking to her, defendant-father would stand in the doorway and question her about returning inside.
As to the letter, the neighbor testified that defendant-mother gave her a folded paper inside the neighbor's home on December 14, 2008, and said she would know what to do with it at the right time. The neighbor testified she did not read the letter until three days later. After discussing the contents with family members, DYFS was notified, although not directly by her, and she turned over the letter to DYFS.
On cross-examination, the neighbor testified that since her last recording made in early 2007, the arguing between defendant-parents was not to the same level and intensity. She said she had spoken to them about what she had heard, and the arguing thereafter became more in the nature of normal marital disputes.
In her testimony, defendant-mother now admitted she wrote the letter quoted previously, but she claimed it was all a lie. She described her husband as "a perfect guy." She said she wrote the letter to "get out anger," and she put the letter in a drawer in her house. She claimed she expected the neighbor to find the letter because the neighbor regularly came into their house. In that way, she wanted to catch the neighbor snooping. She gave two reasons at different times for wanting the neighbor to see what she wroteso that the neighbor would leave her family alone and so that the neighbor would say something to her husband to make him want to move.
In its ruling at the conclusion of the March 12 hearing, the trial court found that defendant-mother's testimony about the letter was not credible. It found that the letter demonstrated a risk of imminent harm to the children that justified their removal and a preliminary order of protection under N.J.S.A. 9:6-8.31 pending a fact-finding hearing. In its order following the removal hearing, the court provided for supervised visitation of the children with defendant-parents.
The fact-finding hearing, in accordance with N.J.S.A. 9:6-8.44, occurred over seven dates from April 2 through December 11, 2009. Defendant-father did not attend but was represented by his attorney at every session, and his attendance was always waived on the record. Defendant-mother was present and represented at each session. By agreement of the parties, *1144 the record of the emergency removal hearing was incorporated as part of the record for the fact-finding hearing on abuse or neglect.
DYFS and the Law Guardian presented testimony from three expert witnesses. Two of the experts had interviewed the parents and one had also evaluated the children, including during a supervised visit with the parents. Defendants did not present any expert testimony. In addition to testimony from its own personnel, DYFS also presented the testimony of defendant-father's second wife on the subject of his alleged acts of domestic violence against her and the two children of that marriage. The court heard argument on the admissibility of that testimony and, at the conclusion of the hearing, ruled that it was inadmissible under N.J.R.E. 404(b). In its final decision, the court disregarded the ex-wife's testimony.
A number of exhibits were also admitted in evidence, including the reports of the expert witnesses, a domestic violence final restraining order obtained by the ex-wife against defendant-father in 2002, a judgment of conviction of defendant-father in 2002 for making terroristic threats against his ex-wife, the police reports previously referenced of calls to the house in 2007-2008, the recording made by the neighbor, and the letter written by defendant-mother.
The Law Guardian presented testimony from Alice Nadelman, Ph.D., a licensed psychologist with thirty years of experience in child welfare matters, including her specialty areas of early childhood trauma, development of normal and disrupted attachment, and special needs adoption. Having interviewed and tested both parents for six hours and observed their interaction with the children during a supervised visitation, and having reviewed the documented record of the case, Dr. Nadelman concluded that (1) "there was significant level of actual risk to the children posed by the parental relationship"; and (2) that each "parent individually did not show at this point, the psychological capacity... to provide safe and appropriate parental care on their own." As part of the latter conclusion, Dr. Nadelman noted that defendant-mother had on more than one occasion expressed her own perception that she could not care for the three children by herself.
Dr. Nadelman determined that domestic violence had occurred in the home and that the parents' untreated psychological conditions caused them to pose a high risk of harm to their children's safety and emotional well-being. Her finding of domestic violence grew largely out of the contents of the quoted letter, the tape-recorded arguments, and the history of domestic violence against the ex-wife, but it was also based on the totality of her evaluation of the evidence, including her assessment that defendant-father consistently views himself as a victim and does not take responsibility for his actions.
DYFS presented testimony from Martha Rezeli, an expert in forensic risk assessment. Rezeli has a bachelor's degree in social work and a master's degree in forensic psychology. As an employee of Catholic Charities, she has done extensive work for DYFS in risk evaluations. In this case, she conducted risk assessments of both parents and reported her findings in detailed reports.
As Dr. Nadelman had, Rezeli concluded that domestic violence in the home and the untreated mental conditions of both parents present a high risk of abuse and neglect of the children. She described three types of risks faced by children living in homes where domestic violence occurs: personal safety, witnessing traumatic events, and neglect because of the *1145 parents' diversion by the violence. She spoke of studies finding that children who are neglected because of violence in the home show physical signs of that neglect, including developmental delay, behavioral problems, and failure to thrive. She testified that the son in this case has displayed aggression toward adults and other children, and he and the older girl exhibit developmental delay in their speech. The parents have not permitted therapy for the developmental delays while the children are in the custody of DYFS, the mother stating that she can understand her children's speech.
Another witness, a DYFS family services specialist, relayed information about the children since the time of their removal from the home. The boy had been aggressive with his sisters, and at one point, took a vacuum cleaner to his sister's throat, saying "I'm going to kill you."[1] The boy told the foster mother on more than one occasion that she was a "bitch" and that he was going to kill her. He had also been aggressive at the school he had been attending, teachers reporting that he had pushed or shoved other children. The boy and the older girl showed substantial speech delays at the outset of their placement. Several months into foster care, both children had made "phenomenal progress."
Some of this testimony was corroborated by Dr. Nadelman, who was called a "bitch" by the three-year-old boy when she prevented him from leaving the room, and also heard the boy call a DYFS employee "bitch" during her observation of the children. At a later point in the hearing, defendant-mother testified that her husband did not use the word "bitch" in their son's presence because his aunt had taught him not to curse.
DYFS also placed in evidence numerous referrals of abuse of the children made by defendant-father since their removal from the home. Almost on a daily basis, the father had made calls or personally complained that his children were being physically abused in the foster home. With a picture of the older daughter showing a small bruise on her arm, he repeatedly claimed that she had been intentionally struck while in the foster home. DYFS found no evidence to support the referrals.
Psychologist Cynthia Lischick, Ph.D., an expert in domestic violence, was called to testify by the Law Guardian regarding her analysis of "the family dynamics." She reviewed more than sixty documents in the case, but did not interview the parents or evaluate the children in person.
Dr. Lischick described the concept of coercive control, which is accepted by experts in her field. She said it was a:
malevolent course of conduct directed toward a social partner in order to dominate that partner using strategies of physical abuse, isolation from support systems, intimidation involving threats, degradation involving emotional abuse, confinement [and] can also include surveillance, and restrictions on the ability to move freely and act independently and make autonomous decisions.
In describing coercive control as a type of domestic violence, Dr. Lischick distinguished it from "episodic assault," in which the abuser uses physical assault to resolve conflict but does not necessarily engage in a pattern of conduct designed to control the partner. Although coercive control can and often does include physical violence, *1146 it can reach a point where less concrete forms of intimidation and fear are utilized. According to Dr. Lischick, the victim becomes trapped in the coercive control relationship, which has an element of psychological paralysis. The dominant partner incorporates his viewpoint into the victim's thinking so that she begins to see the world through his demands as opposed to her own independent thinking. The victim also incorporates the denial of domestic violence and ultimately blames herself for things going wrong in the relationship. Victims may report the abuse but "regularly" recant.
Consequences to children living in such an environment can include disruptions in attachment and developmental delays, but the most likely outcome is aggression. Young children may also internalize the problems, resulting in stomach problems, fears, and night terrors. Long-term effects on children include growing up to be violent adults.
After listening to the two recorded fights between the parents, Dr. Lischick believed that there was "an extreme power differential" and that defendant-mother was trying to get her needs met, but defendant-father prevented her from doing what she wanted to do, which was to leave. On one recording, defendant-mother can be heard screaming, yelling, and cursing angrily. Among other things, she said, "Let me leave" and "I asked you to get out of my way so I can leave and you won't allow me to leave." At one point, she yelled, "No, get off of me." The father can be heard on most of the recording only as a muffled, calmer, but unintelligible voice. However, at one point, when the mother said, "I'm tired of staying here," he replied, "You're not working right now." At another point, she yelled, "Why are you forcing me to stay here? Yeah, you are. I go to the front door and what do you do?... You picked me up and drag me back. That's what you did. Get away from me." During the recording, their son can be heard crying in the background. Dr. Lischick interpreted the quoted excerpts as evidence of physical violence and restraint by defendant-father.
Dr. Lischick was asked about the history of the relationship, which included three occasions when defendant-mother left the marital home without the children and stayed away for some weeks. She described a circumstance recognized in domestic violence literature called "the mother's dilemma" of protecting herself or protecting her children. She testified that victims of coercive control usually choose the option that appears to provide the most safety, including leaving children behind because taking them is more likely to result in pursuit by the partner and risk of harm. She also considered it significant that on two of the occasions when defendant-mother left the home, she stayed with her husband's relatives. She noted that victims of domestic violence leave their abusers an average of seven times before they are able to leave permanently.
Dr. Lischick also reviewed the December 2008 letter given to the neighbor, and an earlier letter defendant-mother wrote in 2007 by which she agreed to give up custody of the children to her husband in the event of divorce. The letters supported Dr. Lischick's conclusion that the relationship was characterized by domestic violence in the form of coercive control.
Like the other experts, Dr. Lischick concluded there was a high risk of harm to the children if they are returned to the home. The effect of the abuse in this home was already manifested in the boy's aggression toward his sisters, classmates, and women, and in the children's speech delays.
*1147 The only witness presented for the defense was defendant-mother. She testified that her husband was a loving, caring father who had never hurt her or the children. She testified about the reasons she had left the home on three occasions, shortly after the birth of each child, and stayed away in Pennsylvania with her or her husband's relatives for a month or two each time. She testified that the children were well-cared for by defendant-father during her absences. She also stated that her leaving home on those three occasions was proof that she was not under the control of her husband.
Defendant-mother also explained the nature of the arguments that were taped by the neighbor, blaming herself and her hormones at a time of pregnancy for her screaming and yelling. She denied any violence against her in those episodes. She said her demands of "leave me alone" or "get off of me" were the result of her husband trying to comfort and calm her when she did not want to be touched. She also said she could have left the home, as she had done previously, and her husband was not restraining her, as the experts believed. She denied that her son was present during the arguments, stating that she did not hear him crying when she listened to the tape.
Regarding the letter, defendant-mother acknowledged that she told Dr. Nadelman she wrote it so that her husband would find it and recognize that she was upset at him. Despite her husband's inability to read, she believed he could understand her writing. She modified her explanation later to indicate that she wanted both her husband and the neighbor to find and read the letter.
As to the reference in the letter to her husband teaching their three-year-old son to kill, she said that they had watched the movie "Halloween" and then father and son had acted out a scene with toy knives. She said it only happened once. She denied that her husband referred to women with the word "bitch" or that he cursed at all.
The trial court placed its decision on the record on December 11, 2009. It focused on whether DYFS had proven that domestic violence had occurred in the home. The court referred to three categories of evidence that DYFS and the Law Guardian were relying upon to prove domestic violence: the recorded arguments, the letter of December 2008, and the treatment of the ex-wife some seven or eight years earlier. The court analyzed in detail and rejected each category of evidence as proving that defendant-father had committed acts of domestic violence against defendant-mother.
With respect to evidence of coercive control as a form of domestic violence, the court found the testimony of Dr. Lischick to be credible and interesting as a matter of theory and potentially applicable in appropriate cases. But the court concluded that, even if it were to accept that coercive control had been proven, "it does not lead to a finding of abuse and neglect in this particular case because of the lack of tie in to ... any particular facts or conduct." The court concluded the evidence did not prove that the children had been abused or neglected. Nevertheless, the court said that the family was in need of services and that the court would next consider the matter under N.J.S.A. 30:4C-12 for remedial services directed to protecting the children's health and welfare.
On December 23, 2009, the court held a dispositional hearing in accordance with N.J.S.A. 9:6-8.45 and N.J.S.A. 30:4C-61.2. It ordered that the parents comply with certain services in preparation for reunification of the family. The court then notified the parties in early January 2010 that *1148 it intended to order the children returned to the parents within sixty days. It entered such an order on April 22, 2010. We granted a stay of that order pending our decision on this appeal.

II.
The Law Guardian and DYFS argue that the trial judge should not have disregarded the testimony of the ex-wife under N.J.R.E. 404(b) in reaching his conclusions about the risk of domestic violence, and hence, abuse or neglect of the children. We agree. We hold that evidence from the ex-wife was admissible to prove that defendant-father was a risk of harm to his children and that defendant-mother's denials of her husband's history of violence also made her a risk of harm to the children.
After making a full record of the ex-wife's testimony for purposes of an appeal, the trial court ruled that her testimony was inadmissible under N.J.R.E. 404(b). That rule of evidence provides in relevant part:
[E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
The ex-wife testified she was married to defendant from 1999 to 2002, and they had a son and a daughter together. She alleged that, from the time they were dating and throughout their marriage, he subjected her to violence, death threats, and constant control. She miscarried her first pregnancy when he pushed her down in a parking lot as she tried to get away from him. When she was pregnant with their son, he "threatened to knock my son out of me." When she was pregnant with their daughter, he grabbed her by the hair and pulled her into a vehicle.
She said that he repeatedly threatened to kill or injure her. He threatened to slit her wrists and put her in the bathtub and tell the police she had committed suicide. He threatened to have their son stab her because a small boy would not be arrested or charged. He also took her on car rides to show her places where he would bury her body. She testified that he "was always threatening to shoot me" and that he "held a knife up to my throat to slice my throat."
She said that defendant nailed the bedroom windows shut and always kept the front door locked keeping the keys on his person. He required that she keep the bathroom door open to make sure she was not sneaking out the window. Although she had a job when they met, he told her either to quit her job or he would take the car away so that she would lose the job. She was "allowed" to drive a car until she tried to drive away and leave him when he went into a store to buy cigarettes. He caught up to the car at a traffic light and got in with a spare key that he kept on his person. After that, he would not let her drive.
When riding in the car, the ex-wife was required to look at the floor and nothing else. In 2002 during a trip to his aunt's home with the children, she looked up and saw an older man walking down the road. Defendant became angry and grabbed onto her leg and "squeezed" it "really hard," would not let her out of the car, then threatened to throw her out of the car, "thrash" her up and down the road, and run her over. When they reached their destination, she took their six-month *1149 old daughter in her arms and their son by the hand and she tried to run away. He caught up to her and took their son; she kept running with their daughter. The police got involved, and she did not get her son back for at least a week. She then applied for a restraining order and moved to an Air Force base with family in Florida to be away and safe from him.
The ex-wife obtained her domestic violence restraining order in 2002, and it is still in effect. Defendant was charged criminally with making terroristic threats and criminal restraint. He subsequently pleaded guilty to the terroristic threats charge and was sentenced to a term of probation.
As to the children, the ex-wife testified defendant was abusive "to an extent." To discipline their son, he would hold a vacuum up to the boy's face, which resulted in the boy "screaming bloody murder" every time she used a vacuum. When their daughter was about six months old, he "knocked her back on the floor and called her a little bitch and said: `Get away from me, I don't like you, you are a female.'"
After she moved away, the son refused to listen to her because "he was always taught to disrespect me." She could not bring her son around "anybody that wasn't white" because the son would say "terrible things" that defendant had taught him. Other than a few supervised visits with their children in 2005 after she returned from Florida, he has not seen the children and does not support them financially.
On cross-examination, the ex-wife was confronted with a lengthy letter she had written at the time of the criminal charges disclaiming the truth of the allegations and asking that the charges be dropped. She testified that she was forced to write the letter by defendant's aunt, who repeatedly came to her home and harassed her about the matter.
In his final decision, the judge addressed the ex-wife's testimony as follows:
[A] very serious matter, but it occurred in a prior relationship, with other children, seven or eight years before the instant proceeding. To say that the incident itself would constitute enough to demonstrate that there is abuse and neglect in 2008 with respect to this family I think is stretching the matter somewhat. It does not involve any specific conduct with respect to this family. And for the court to say that there is a propensity to violence and that is the reason not only violates 404(b), which is concerning prior bad acts, but it would in effect tag anyone who has been involved in domestic violence with almost a permanent or a danger of permanent disability as to future parenting. And as S.S.[2] teaches us, we need to know something specific about what is going on in this case, not that this man did something bad seven years ago to another family.
"Ordinarily, the admissibility of other-crime evidence is left to the trial court's discretion, and its decision is reviewed under an abuse of discretion standard." State v. Darby, 174 N.J. 509, 518, 809 A.2d 138 (2002). Here, however, our disagreement with the trial court's ruling is on a question of law and, therefore, our standard of review is plenary. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Most of the numerous cases that have addressed the purpose and application of N.J.R.E. 404(b) have been criminal *1150 prosecutions. The rule "seeks to guard a defendant's right to a fair trial by avoiding the danger that a jury might convict the accused because the jurors perceive him to be a `bad person.'" State v. Ramseur, 106 N.J. 123, 265, 524 A.2d 188 (1987). "There is widespread agreement that other-crime evidence has a unique tendency to turn a jury against the defendant." State v. Stevens, 115 N.J. 289, 302, 558 A.2d 833 (1989).
In New Jersey state courts, the rule is one of "exclusion" rather than "inclusion" and should be used to exclude evidence of other crimes, civil wrongs, or acts when such evidence is "offered solely to establish the forbidden inference of propensity or predisposition." State v. Nance, 148 N.J. 376, 386, 689 A.2d 1351 (1997). Nevertheless, the examples set forth in the rule concerning the permissible uses of other-crimes evidence "are not intended to be exclusive." Id. at 388, 689 A.2d 1351 (quoting Stevens, supra, 115 N.J. at 299, 558 A.2d 833).
A four-part test for determining whether other-crimes evidence is admissible was established in State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992), and State v. Marrero, 148 N.J. 469, 483, 691 A.2d 293 (1997). To be admitted: 1) evidence of the other crime or act "must be admissible as relevant to a material issue"; 2) "[i]t must be similar in kind and reasonably close in time to the offense charged"; 3) "[t]he evidence of the other crime or act must be clear and convincing"; and 4) "[t]he probative value must not be outweighed by its apparent prejudice." Cofield, supra, 127 N.J. at 338, 605 A.2d 230. This test was recently re-confirmed in State v. P.S., 202 N.J. 232, 263-64, 997 A.2d 163 (2010).
Other-crimes evidence can be admitted to prove any fact in issue, but the issue must be genuine and the other-crime evidence necessary for its proof. Stevens, supra, 115 N.J. at 301, 558 A.2d 833. Where other-crime evidence tends to make the existence of a material fact reasonably likely, it is admissible subject to the "probative/prejudice" balancing under N.J.R.E. 403. Marrero, supra, 148 N.J. at 482, 691 A.2d 293.
Furthermore, in appropriate contexts, the Supreme Court has declined to apply the Cofield test strictly to determine the admissibility of relevant evidence. For example, the Court has acknowledged that the second part of the test is not expressly stated in the language of the rule and "need not receive universal application in Rule 404(b) disputes." State v. Williams, 190 N.J. 114, 131, 919 A.2d 90 (2007); see also Hill v. N.J. Dep't of Corr., 342 N.J.Super. 273, 304, 776 A.2d 828 (App. Div.2001) (second part of Cofield test not applicable to other crimes or wrongs evidence relevant to motive), certif. denied, 171 N.J. 338, 793 A.2d 717 (2002). The Court has also rejected the argument that uncorroborated testimony by a cooperating informant or co-defendant cannot satisfy the third part of the Cofield test, that the other crimes or acts be proven by clear and convincing evidence. State v. Hernandez, 170 N.J. 106, 126-27, 784 A.2d 1225 (2001).
In the context of an abuse or neglect case, we have previously said that N.J.R.E. 404(b) and the Cofield test are applicable to historical evidence of similar conduct. N.J. Div. of Youth & Family Servs. v. H.B., 375 N.J.Super. 148, 181, 866 A.2d 1053 (App.Div.2005). But the focus of our opinion in H.B. was not on N.J.R.E. 404(b), or whether the history in that case established a risk of harm to the child. Rather, we said that the trial court should consider admissibility of evidence pertaining to a single incident of allegedly similar *1151 sexual abuse some twelve years earlier as potentially relevant to prove intent, plan, or absence of mistake under N.J.R.E. 404(b). See, e.g., State v. Covell, 157 N.J. 554, 563-71, 725 A.2d 675 (1999); State v. Cusick, 219 N.J.Super. 452, 464-66, 530 A.2d 806 (App.Div.). certif. denied, 109 N.J. 54, 532 A.2d 1118 (1987).
We now hold that in civil proceedings for the protection of a child, a parent or guardian's past conduct can be relevant and admissible in determining risk of harm to the child. N.J.S.A. 9:6-8.46a states that "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of... the parent or guardian." Thus, the statute itself provides for admissibility of evidence about other children. See N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J.Super. 576, 609, 914 A.2d 318 (App. Div.), certif. denied, 192 N.J. 68, 926 A.2d 853 (2007); Div. of Youth & Family Servs. v. Robert M., 347 N.J.Super. 44, 68, 788 A.2d 888 (App.Div.), certif. denied, 174 N.J. 39, 803 A.2d 635 (2002).
Although not raised in the context of N.J.R.E. 404(b) or its predecessor, Evid. R. 55, we have recognized that "[p]redictions as to probable future conduct can only be based upon past performance," and "[e]vidence of parents' fitness or unfitness can be gleaned not only from their past treatment of the child in question but also from the quality of care given to other children in their custody." J. v. M., 157 N.J.Super. 478, 493, 385 A.2d 240 (App. Div.), certif. denied, 77 N.J. 490, 391 A.2d 504 (1978); see also State v. Elmore, 205 N.J.Super. 373, 384, 500 A.2d 1089 (App. Div.1985) ("[P]rior episodes of child abuse unconnected with cause of an infant's death were admissible under Evid. R. 55 as proof of intent or absence of mistake or accident."). The statute, N.J.S.A. 9:6-8.46a, and the cases cited make no distinction between children in the current relationship and children of a previous relationship.
A history of violence is also made expressly admissible by statute in domestic violence cases, albeit within the same relationship. The Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (Domestic Violence Act), explicitly provides that the history of abuse in the same relationship is admissible to prove the current domestic violence alleged. In fact, in a domestic violence case, the court is required to take into consideration the prior history of domestic violence between the parties. N.J.S.A. 2C:25-29a(1); Cesare v. Cesare, 154 N.J. 394, 401-02, 713 A.2d 390 (1998); H.E.S. v. J.C.S., 175 N.J. 309, 319, 815 A.2d 405 (2003). In Cesare, the Court recognized the "reality that domestic violence is ordinarily more than an isolated aberrant act," and found that "[b]ecause a particular history can greatly affect the context of a domestic violence dispute, trial courts must weigh the entire relationship between the parties" and could "consider evidence of a defendant's prior abusive acts regardless of whether those acts have been the subject of a domestic violence adjudication." 154 N.J. at 405, 713 A.2d 390.
Thus, the statutes themselves provide that other acts of abuse or neglect and of domestic violence, at least within the same relationship, are relevant and, indeed, must be considered.
In this case, all the experts agreed that a defendant's history of prior domestic violence is vital in assessing the risk of harm to an alleged victim of domestic violence or other abuse. Their opinions went beyond the relationship of the immediate family, finding that defendant-father's history of past domestic violence against his ex-wife was also very important in assessing *1152 the risk that he was a danger to his current wife and children.
Dr. Lischick testified that defendant-father's past relationship, although dating back about seven or eight years, had "extreme significance" in her assessment. She said that a documented history of domestic violence, including both convictions and calls for help where an arrest is not made, is "one of the best predictors about re-offense, recidivation." Dr. Nadelman found it particularly significant that defendant-father did not acknowledge his documented history of domestic violence against his ex-wife, and therefore, his "violent tendencies" were "unremediated." She found a high level of risk to the children because the parents were exhibiting both clinical and actual denial of the prior violence. Rezeli, the expert in risk assessments, approached the issue from indications that prior efforts to counsel and treat defendant-father's violent inclinations against his ex-wife had apparently been unsuccessful, as now evidenced by defendant-mother's letter of December 2008 given to the neighbor. Thus all the experts testified that the history provided by the ex-wife was evidence of risk of current domestic violence and abuse or neglect of the children.
The trial judge understood the significance of the experts' testimony but concluded that evidence of the risk that defendant-father would again engage in domestic violence was essentially synonymous with evidence of his propensity or disposition to commit domestic violence. The judge concluded that the evidence was therefore prohibited by the language of N.J.R.E. 404(b) when based on prior crimes or bad acts.
The abuse or neglect statutes, however, expressly require that the court assess risk to the children. N.J.S.A. 9:6-8.21c(4), -8.31b. By the language of those statutes, the Legislature has made risk of harm, not just past injury or acts, relevant to determining whether a child is an abused or neglected child. Consequently, the risk, or pre-disposition, that a defendant may harm the children is expressly admissible in an abuse or neglect case despite the general evidentiary prohibition contained in N.J.R.E. 404(b).
We also note that in abuse or neglect cases, a judge rather than a jury hears the evidence and makes findings of fact. One of the primary reasons for the prohibition of character evidence to show disposition, namely, misuse of that evidence by lay jurors, is not present in such a non-jury case. A judge, trained and experienced in using evidence only for its proper purposes, and charged with protecting the rights and interests of all parties, is much less likely to be prejudiced against a defendant by reaching a conclusion that the defendant is simply a person of bad character. See State v. Kern, 325 N.J.Super. 435, 444, 739 A.2d 969 (App. Div.1999) ("judge sitting as the factfinder is certainly capable of sorting through admissible and inadmissible evidence without resultant detriment to the decision-making process").
Our conclusion does not mean that N.J.R.E. 404(b) should never be applied in abuse or neglect cases to determine admissibility of other crimes or bad acts evidence. See H.B., supra, 375 N.J.Super. at 181, 866 A.2d 1053. We only hold that where expert testimony in an abuse or neglect case provided support for a finding that defendant's prior acts of domestic violence show his disposition to commit such violence, the court should have admitted that evidence in assessing risk of harm to the children.
We also do not suggest that any such past domestic violence, no matter how *1153 remote or dissimilar to the current allegations, must be admitted in an abuse or neglect case. The trial judge may determine under N.J.R.E. 403 that particular evidence should be excluded because its probative value is substantially outweighed by undue prejudice, confusion of the issues, delay, waste of time, or needless presentation of cumulative evidence. In this case, the experts were consistent in their testimony that defendant-father's history of domestic violence against his ex-wife was not too remote to be highly probative of assessing risk at this time. We agree with those opinions.
In State v. Eatman, 340 N.J.Super. 295, 297-301, 774 A.2d 571 (App.Div.), certif. denied, 170 N.J. 85, 784 A.2d 718 (2001), we held that prior acts of abuse and violence against women other than the current victim, dating back up to thirty-two years, were relevant in psychiatric assessment of the defendant's "barely suppressed rage against women as evidenced by a long-standing pattern of domestic violence." As supported by the expert testimony in this case, evidence of violence against the ex-wife and other children was highly probative and not too remote in time.
Additionally, not every allegation of domestic violence in the ex-wife's testimony must be accepted as proven and true. There is no dispute, however, that a documented history of past domestic violence was proven, including the entry of a final restraining order and the criminal conviction.
We conclude that evidence of domestic violence committed against the ex-wife and the children of defendant-father's prior marriage was admissible to prove abuse or neglect in this case.

III.
The Law Guardian and DYFS argue that the trial court reached erroneous conclusions also because it failed to assess accurately the probative value of the letter of December 2008 and the recording made by the neighbor as evidence of domestic violence occurring in the home. They contend that the trial judge was inconsistent in crediting the testimony of defendant-mother about the absence of domestic violence after it had found her not to be credible following the initial hearing on emergency removal. They also contend that the trial judge did not make credibility findings concerning the unrefuted testimony of the three experts they presented. We disagree with these arguments. The trial judge assessed the evidence and made credibility findings that are supported by the record.
We have a strictly limited standard of review from the fact-findings of the Family Part judge. See Cesare, supra, 154 N.J. at 412-13, 713 A.2d 390. "[F]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J.Super. 427, 433, 798 A.2d 673 (App.Div.2002) (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974)).
The trial court "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a `feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104, 952 A.2d 436 (2008); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293, 914 A.2d 1265 (2007); N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J.Super. 77, 89, 946 A.2d 62 (App.Div.2008). "[I]n reviewing the factual findings and conclusions of a trial judge, we are obliged to accord deference *1154 to the [ ] court's credibility determination... based upon ... [the] opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J.Super. 593, 616, 992 A.2d 20 (App.Div. 2010) (quoting State of N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J.Super. 81, 88, 906 A.2d 463 (App.Div.2006), certif. denied, 190 N.J. 257, 919 A.2d 850 (2007)).
Here, the Family Part judge made logical credibility findings supported by the evidentiary record. In his December 11, 2009 decision on abuse or neglect, the judge made the following findings regarding defendant-mother:
I got a problem with the way she testified. She was all over the place with respect to that letter.... First she said she didn't write it, then she said: I wrote it but I was trying to get [defendant-father]I wanted to show him that I was upset ... then she said: I wrote it soto prove that [the neighbor] was stealing stuff out of our house, all mutually inconsistent.
But there were things she said that make it difficult for me to impose a false in one, false in all-type of approach to her testimony. She did say she was angry with her husband.... She did say on the record that she was angry with him for not showing up in court. So [for] me to find in effect that every time she opens her mouth she lies, and the Court must presume the opposite of what she was saying is a stretch. There were times she testified credibly and against her husband in this proceeding.
The judge then discussed the letter, which was "of great concern" to him, and found that defendant-mother "was in some kind of fear, and it is possible that the fear was mixed with some other [emotion]." He concluded:
I can't totally disregard [her] testimony in that regard, although it is inconsistent. She went back and forth. And I attribute that to some extent to sheer embarrassment over this whole situation. But it shows at one point in December of 2008 she was in fear.
Considering these credibility findings and the contents of the letter, the judge concluded that there was "not enough" in the letter, "especially with the recantation, to prove domestic violence."
The Law Guardian and DYFS argue that this appeal is the rare situation where we should disregard the judge's credibility finding because it "went so wide of the mark that a mistake must have been made." M.M., supra, 189 N.J. at 279, 914 A.2d 1265. We do not view the judge's credibility findings as "wide of the mark."
There was no inconsistency in the judge's credibility determinations. After each hearing, the judge found defendant-mother's explanations for writing the letter were not credible. After listening to days of testimony and gathering additional evidence and insight about the circumstances of the relationship, including testimony from the expert witnesses about their interviews of the parents, the judge determined that certain aspects of defendant-mother's explanation of her motivation may be true. That determination was not only within the judge's proper fact-finding function but supported by the evidence presented at the hearing.
Furthermore, even if defendant-mother's explanations of reasons for writing the letter were completely fabricated, her false testimony did not amount to evidence that everything she wrote in the letter was the truth. The false recantation of a witness does not by itself prove the opposite proposition, that the prior statement is true.
The judge weighed the statements in the letterthat her husband had threatened and tried to kill her, that either he or his *1155 friends might do it in the future, that he might hurt the children, that he was always putting his hands on her, that he had already stabbed her hand with a screwdriver, that he teaches their three-year-old son how to kill, and that she was in fear for her lifeagainst defendant-mother's repeated testimony under oath that she was not the victim of domestic violence. He found that the letter showed defendant-mother was in fear at some point in December 2008 but it did not prove specific acts of domestic violence had actually occurred. We cannot conclude that the judge "went wide of the mark" in reaching those conclusions about the letter. As we will discuss, however, the letter had broader probative value than as proof of specific acts of violence.
The Law Guardian and DYFS also argue that the judge did not assess accurately the tape recording made by the neighbor. They claim, as did their experts, that the recording proves that defendant-mother was subjected to physical violence because she can be heard saying "leave me alone," "get off of me," "you're hurting me," and "let me out."
According to testimony and the trial court's findings, defendant-mother can be heard on the recording screaming, yelling, and cursing repeatedly for more than thirty minutes while defendant-father's voice is unintelligible but calm. Defendant-mother testified that the argument occurred in early 2007 while she was pregnant with the second child and her hormones were affecting her emotionally. She testified that her husband was attempting to calm her down and never struck her or prevented her from leaving the house.
Before his decision at the end of the fact-finding hearing, the trial judge listened to the recordings and evaluated first-hand their content. The judge determined that one of the recordings was almost entirely inaudible, with only sporadic intelligible words amounting to a small fraction of the entire recording. He could not make any determination from that episode about what was occurring. Regarding the second one, he made the following findings:
I have listened to the tape, listened to the part where [defendant-mother] says "Get off me," listened to everything else, listened to [the boy] screaming during the tape.... [I]t's an ugly listen, but to take a step back, [defendant-mother] testified that the "get off me" was he was approaching her to try to hug her, but not necessarily violently. I will note that at that point in the tape there is no indication, nothing, no noise or anything, indication of any violent struggle. So there is simply no proof that anything violent was being done other than her comments.
And the tone of her voice at that stage, and I have listened to herI have listened to her in court, was actually somewhat calmer than the F____ [you]'s that were repeated by her 70 times or more. So I have no basis on that.
And really, if you listen[,] the expert reports, theythey base themselves to a large extent on that part of that tape which was 10 seconds out of a half hour. I can't find that that incident necessarily is proof of anything.
We see no error in the judge's conclusion that the recording did not prove an act of physical domestic violence by defendant-father. The judge did not err in disagreeing with the experts' opinions in that respect.
We disagree, however, with the last-quoted commentthat the recorded incident did not prove "anything." It appears that the judge was focused on determining whether acts of physical domestic violence *1156 as recognized by our domestic violence laws had been proven. We think the allegations of the complaint and the proofs presented were intended to show domestic violence in a broader sense than predicate acts of violence that would have satisfied the requirements of the Domestic Violence Act.
The purpose of the fact-finding hearing in an abuse or neglect proceeding is to determine whether a child is an abused or neglected child, N.J.S.A. 9:6-8.44, not to assign guilt to a defendant. Under the statutory framework, "the safety of the child shall be of paramount concern." N.J.S.A. 9:6-8.28a, -8.31 a, -8.32, -8.49. The evidence supported a finding of domestic violence in a more general sense as that phrase was used and is understood by psychologists working in the field of domestic violence and family dynamics and, in particular, the expert witnesses who testified in this case.
In M.M., supra, 189 N.J. at 279, 914 A.2d 1265, the Supreme Court cited with approval our holding in In re Guardianship of J.T., 269 N.J.Super. 172, 634 A.2d 1361 (App.Div.1993), establishing a broader scope of appellate review where the issue is not the facts that were found but rather evaluation of those facts under the applicable law. In J.T., we held there are two exceptions to the strictly limited scope of appellate review from a decision of a trial judge sitting without a jury.
First, where the judge goes so wide of the mark as to be "clearly mistaken and so plainly unwarranted that the interests of justice demand intervention and correction." Formosa v. Equitable Life Assurance Soc'y, 166 N.J.Super. 8, 20 [398 A.2d 1301] (App.Div.), certif. denied, 81 N.J. 53 [404 A.2d 1153] (1979); Maggio v. Pruzansky, 222 N.J.Super. 567, 577 [537 A.2d 756] (App.Div.1988). Second, "where the focus of the dispute is not credibility but, rather, alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," the traditional scope of review is expanded. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J.Super. 65, 69 [558 A.2d 28] (App. Div.), certif. denied, 117 N.J. 165, 564 A.2d 883 (1989).
[J.T., supra, 269 N.J.Super. at 188-89, 634 A.2d 1361.]
In this case, we do not view the trial court's credibility determinations or assessment of individual pieces of evidence as "wide of the mark." The focus of our disagreement with the trial court is the implications to be drawn from the evidence.
In evaluating the evidence, the trial court said, "there must be some actual conduct by the defendants warranting intervention." Because it concluded DYFS had not proven that defendant-father committed acts of domestic violence, the court found DYFS had also failed to prove that the children had been abused or neglected. We think that the allegations brought by DYFS did not require proof of domestic violence within the meaning of the Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. In the context of abuse or neglect of children, a pattern of parental conduct can place the children at risk of harm as contemplated in N.J.S.A. 9:6-8.21c(4) without proving a particular episode of physical or similar domestic violence as defined in the Domestic Violence Act, N.J.S.A. 2C:25-19.
N.J.S.A. 9:6-8.21c(4), in relevant part, defines an "abused or neglected child" as:
a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his or her parent or guardian to exercise a minimum degree of care: ... (b) in *1157 providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

[N.J.S.A. 9:6-8.21c(4) (emphasis added).]
DYFS must prove that a child was abused or neglected by a preponderance of the evidence. N.J.S.A. 9:6-8.46b; N.S., supra, 412 N.J.Super. at 615, 992 A.2d 20.
In G.S. v. Department of Human Services, 157 N.J. 161, 723 A.2d 612 (1999), the Court reviewed the meaning of the quoted statutory language. It held the statute did not require that the parent intended to harm the child. Id. at 176, 723 A.2d 612. It held that "the phrase `minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Id. at 178, 723 A.2d 612.
Grossly or wantonly negligent conduct would not satisfy the elements necessary to prove domestic violence under the Domestic Violence Act. That law requires proof of a specific predicate act of domestic violence from among the fourteen offenses within the Code of Criminal Justice listed in the statute. N.J.S.A. 2C:25-19a; see Cesare, supra, 154 N.J. at 400-01, 713 A.2d 390. The listed predicate offenses require purposeful, knowing, or reckless conduct.
In this case, each of the three experts testified that the totality of the evidence they reviewed proved a relationship in which defendant-father engaged in coercive control of defendant-mother. They testified that the recorded arguments were an example of that coercive control. Even if defendant-mother was physically able to leave the home at the time of those arguments, she had demonstrated her psychological entrapment through the prior instances of leaving and then coming back, her willingness to give up her children to defendant-father or DYFS to preserve her own safety, and her total denial of her husband's documented violent and abusive past. The experts testified uniformly that defendant-mother was in dire fear of her husband, as most vividly evidenced by the highly unusual letter she gave to her neighbor.
All three also testified that the documented history of violence against the ex-wife was very relevant to predicting future violence and thus assessing risks to the children. Whether the accounts of past violence were admissible substantively as proof of domestic violence against the current wife, those proofs were the kind of information relied upon by experts in the field of domestic violence to evaluate the risks involved. See N.J.R.E. 703.
The experts concluded that the parents' relationship and their untreated psychological conditions created a high degree of risk that the children would be harmed. Most important, the two licensed psychologists testified that the children, at the ages of two and three, were already manifesting the effects of the coercive and violent relationship of their parents. The boy was disturbingly combative and disdainful of adult authority. His behaviors of calling women "bitch" or threatening to kill his sister with a vacuum cleaner were not natural and could only be learned conduct. At his age, and not enrolled in a school or daycare until he was removed from the home, he must have learned those behaviors while in the care of his parents. The parents' denials were not credible.
Although the developmental delays of speech are not so readily attributed to the parents' conduct in the home, they are further evidence of potential effects on the *1158 children of the parents' conduct and psychological inability to understand and remedy the harm.
Citing our holding in S.S., supra, 372 N.J.Super. at 22-26, 855 A.2d 8, the trial court recognized correctly that the act of allowing a child to witness domestic violence does not equate to abuse or neglect of the child in the absence of additional proofs. Likewise, exposure of children to a coercive control relationship does not by itself prove abuse or neglect. In this case, however, unlike S.S., the court heard credible evidence that professionals in the field accept the general proposition that domestic violence in the home harms children and that harm had occurred in this family. We also note our Legislature's explicit finding and declaration in the Domestic Violence Act that "children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence." N.J.S.A. 2C:25-18.
In addition, the experts considered the parents' psychological deficits as dangerous to the children. "[A] psychiatric disability can render a parent incapable of caring for his or her children." I.Y.A., supra, 400 N.J.Super. at 94, 946 A.2d 62. "That the parents may be morally blameless is not sufficient to tip the scales in their favor." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J.Super. 418, 436, 438, 782 A.2d 458 (App.Div.2001), certif. denied, 171 N.J. 44, 791 A.2d 222 (2002).
Dr. Nadelman, who spent six hours evaluating the parties through tests and interviews, found defendant-father to be a "depressed, dejected" and "despondent" person who acknowledged suicide attempts in the past and suicidal ideation in the present, and felt hopeless, worthless, useless, and ineffective. She concluded that he was at high risk of psychologically harming his children based on his level of depression, and of physically abusing his children based on his "unacknowledged and untreated rage" and "capacity to become aggressive" when he felt thwarted.
Dr. Nadelman found that defendant-mother was a "seriously disturbed woman," who demonstrated hysteria, paranoia, and disordered thinking. Her "current level of psychiatric disturbance would impair her ability to provide safe or adequate care for children on her own." Defendant-mother did "not have the willingness or the capacity" to care for the children safely. As a result, the children were at "high risk" if left in her care.
By her risk assessments, Rezeli also concluded that defendant-mother was "laboring with serious mental health issues that must be addressed before she can safely parent." She found that defendant-father had "serious" mental health issues, including his "self-view as a victim which dominates his emotions, thought process and actions and promotes negative and self-defeating behaviors."
Defendant-father denied his son's aggressive behavior, and both parents denied the children's developmental delays. They refused to permit therapy for the children's speech delays. Defendant-father also refused to engage in domestic violence counseling while the case was pending, stating that he was not violent. Their denials meant that the parents had in the past, and would in the future, refuse necessary treatment for their children, which Rezeli considered neglect, and would resist counseling and therapy for their own deficits.
We conclude that the trial court's focus on a "tie in ... to particular facts or conduct," in the sense of domestic violence within the meaning of the Domestic Violence Act, N.J.S.A. 2C:25-19, improperly influenced its view of the implications to be *1159 drawn from the totality of the evidence in this case. The expert testimony, even if not accepted in all respects, was supported by the factual evidence, especially the manifestation of abuse or neglect in the children's behavior and development.
Here, as in G.S., supra, 157 N.J. at 181, 723 A.2d 612, defendant-parents failed "to exercise a minimum degree of care" in that, although "aware of the dangers inherent in a situation[,]" namely, their abusive relationship and serious psychological disabilities, they "recklessly create[d] a risk of serious injury" to their children by failing to protect the children from harm and failing to acknowledge and treat their disabilities. Through the totality of the evidence, DYFS and the Law Guardian proved that the three children were abused or neglected within the meaning of N.J.S.A. 9:6-8.21c(4).

IV.
We reverse the Family Part's decision and remand for a dispositional hearing under N.J.S.A. 9:6-8.45.
NOTES
[1] In his interview with Rezeli, defendant-father had described a traumatic incident in his childhood where his abusive grandfather, with whom he lived, attacked him with a vacuum cleaner.
[2] N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J.Super. 13, 22-26, 855 A.2d 8 (App. Div.2004), certif. denied, 182 N.J. 426, 866 A.2d 983 (2005).