# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5354-18T1

P.E.O.,

    Plaintiff-Appellant,

v.

R.J.,

    Defendant- Respondent.

_____

Argued telephonically April 22, 2020 –
Decided May 11, 2020

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-3008-19.

Celeste Fiore argued the cause for appellant (Argentino Family Law & Child Advocacy, LLC, attorneys; Celeste Fiore and Jodi Ann Argentino, on the brief).

Respondent has not filed a brief.

PER CURIAM

Plaintiff, P.E.O.,[1] appeals after trial from the June 28, 2019 denial of a final restraining order (FRO), pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The trial court found that plaintiff's wife, R.J., a black belt in martial arts and kickboxing instructor, assaulted her, causing physical injuries, and also falsely imprisoned her. Nonetheless, the trial court determined that a FRO was unnecessary to protect plaintiff from future acts or threats of violence. We now reverse.

The parties, who were together since 1996, married in Canada in October 2003. The two women had two children together using an anonymous sperm donor. Defendant carried both children, and both parties are listed as the parents on the children's birth certificates.

In January 2019, defendant asked plaintiff for a divorce. Plaintiff testified that "[t]here[] [had] been tension" between them, they "did not communicate very well," and a pattern of name calling had developed. Plaintiff believed defendant began a romantic relationship with her co-worker and kickboxing instructor, however, defendant testified that he was only a "good friend." On March 15, 2019, plaintiff called defendant's co-worker approximately seventy

---

[1] We use initials to protect the identity of victims of domestic violence and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(9) to -(10).

times in hopes of making "it difficult for him [so] that he would leave [defendant] alone."

Five days later, plaintiff visited the co-worker's daughter's Instagram page and commented below a post, "Why don't you ask your father why he's sleeping with a married woman." About "three to four minutes" later, when she tried to delete the comment, it was no longer there. Upon plaintiff arriving home from work that night, defendant confronted her about the comment. Plaintiff walked into the laundry room and defendant followed her in there. Plaintiff testified defendant "had backed [her] up" into the ironing board and punched her in the face and chest. Although plaintiff explained at trial that because she "had a concussion . . . [she] ha[s] holes in [her] memory," she said defendant also put her "hand on [plaintiff's] throat and said, something to the effect of [']I could kill you['] or [']I would kill you. [']"

When plaintiff told defendant that their son was standing behind them, defendant left the laundry room, closing the door. Plaintiff tried to leave, but defendant held the door shut. About "[thirty] seconds to a minute" later, plaintiff was able to exit the laundry room and saw defendant gathering things together for herself and the children to leave the home. Over plaintiff's objections, defendant left the marital apartment with the children.

3

A-5354-18T1

Defendant testified to a somewhat different incident. While she admitted that she confronted plaintiff in the laundry room about the Instagram comment and held the door shut, defendant testified that she did not punch plaintiff at that time. Rather, defendant claimed that while she was collecting items for herself and the children from the bedroom, she heard plaintiff tell a mutual friend over the phone that defendant was being "violent" and "aggressive." Defendant went towards plaintiff to try to speak into the phone, but as plaintiff moved away, defendant explained she saw plaintiff's "hand coming up towards [her]," so she "ducked out of the way and . . . punched" plaintiff in self-defense. Defendant testified, "I was shocked. I, also, couldn't believe that I would do something like that. I don't do things like that. I am not a violent person." Plaintiff then pushed defendant, who sustained bruising.

After defendant left, the police responded to plaintiff's call at about 10:00 p.m. Plaintiff told the police what defendant did and explained she "was not concerned . . . [defendant] would harm the children." She did not seek a temporary restraining order (TRO) at that time because she did not want defendant to be arrested in front of the children.

Plaintiff had redness and a cut on her chin the evening of the incident. The next day, she visited an urgent care but was directed to go to the emergency

room. Plaintiff's hospital discharge summary explained that she might have a concussion. She testified that in the days following the incident, she "had headaches and pain . . . around [her] eye, [and her] cheek and had difficulty concentrating and completing [her] work."

Plaintiff vacated the marital apartment and stayed in a hotel for two weeks with her father. Whenever plaintiff visited the children, she asked her father to accompany her because she "was afraid that [she] would be hurt again." On March 30, 2019, during one of plaintiff's prearranged visits, defendant texted plaintiff to "[s]top milling the fuck around and leave" the apartment and called plaintiff a "piece of sh[i]t." Two days later, plaintiff amended her police report to include that she had "a contusion under her right eye and on her chest." The attending officer asked plaintiff whether she wanted to file a TRO, but plaintiff declined to do so.

Plaintiff testified that because she was still afraid of defendant, and her father could not be with her forever, she spoke to a domestic violence agency and realized "what [she] needed to do for [her]self was to file for the restraining order." On April 8, 2019, plaintiff obtained a TRO against defendant, alleging defendant subjected her to assault, terroristic threats, criminal restraint, false imprisonment and harassment. The FRO hearing occurred over two days. The

court heard from plaintiff, defendant and the police officer who responded to plaintiff's call on the night of the incident. Plaintiff entered into evidence photographs depicting her injuries, spanning from the date of the incident, March 20, to March 28, 2019. Defendant also presented photographs of the bruising on her forearm sustained from plaintiff shoving her after being hit.

On June 28, 2019, while the court was delivering its oral opinion, plaintiff suffered a panic attack and a nosebleed, requiring medical attention. When the proceeding resumed, plaintiff's counsel unsuccessfully asked for an adjournment until the next business day because plaintiff was no longer present. Although the court found defendant assaulted and falsely imprisoned plaintiff, the FRO was denied.

"We have a strictly limited standard of review from the fact-findings of the Family Part judge." R.L.U. v. J.P., 457 N.J. Super. 129, 134 (App. Div. 2018) (quoting N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010)). Because a Family Part judge "possess[es] special expertise in the field of domestic relations," we defer to those factual findings. Cesare v. Cesare, 154 N.J. 394, 412-13 (1998). Furthermore, we defer because Family Part judges have the "opportunity to make first-hand credibility judgments about the witnesses who appeared on the stand." R.L.U., 457 N.J.

6

Super. at 134. Therefore, when considering a FRO we "grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013).

We may, however, disturb the factual findings and legal conclusions of the trial court if we are "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Questions of law are reviewed de novo. R.L.U., 457 N.J. Super. at 134.

Plaintiff argues that because the trial court found defendant had committed physically violent predicate acts of domestic violence, a FRO should have been entered as a matter of law. Relying upon A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App Div. 2016), she asserts analysis of "the second prong of Silver[2] is not even necessary in light of a violent predicate act."

The PDVA "is intended to assist those who are truly the victims of domestic violence." Silver, 387 N.J. Super. at 124 (quoting Kamen v. Egan, 322 N.J. Super. 222, 229 (App. Div. 1999)). When deciding whether to grant a FRO, the trial court has a "two-fold" task. Id. at 125. A court must first determine

---

[2] Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).

whether the plaintiff can demonstrate by a preponderance of the evidence that the defendant has committed a predicate act of violence under N.J.S.A. 2C:25-19(a).  Ibid.

The court must then determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C: 25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse."  Id. at 127.  The court should consider, but is not limited to six factors, of which four are relevant here:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child
>
> [N.J.S.A. 2C:25-29(a)(1) to -(4).]

Of the five acts of domestic violence plaintiff alleged, the court found that plaintiff established by a preponderance of the evidence the predicate acts of assault, N.J.S.A. 2C:12-1(a)(1), and false imprisonment, N.J.S.A. 2C:13-3. Assault occurs when a person "[a]ttempts to cause or purposely, knowingly or

recklessly causes bodily injury to another." N.J.S.A. 2C:12-1(a)(1). "Bodily injury means physical pain, illness or any impairment of physical condition." N.J.S.A. 2C:11-1(a). False imprisonment occurs when a person "knowingly restrains another unlawfully so as to interfere substantially with his [or her] liberty." N.J.S.A. 2C:13-3. The court emphasized that defendant admitted to punching plaintiff and that plaintiff "produced pictures which show[ed] redness on her face, bruising under her eye and bruising on her chest."

"When the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue a FRO 'is most often perfunctory and self-evident.'" A.M.C., 447 N.J. Super. at 417 (quoting Silver, 387 N.J. Super. at 127).

In discussing the N.J.S.A. 2C:25-29(a) factors, the court reasoned that a FRO was not necessary to protect plaintiff. The court noted that no history of domestic abuse existed. Although after defendant told plaintiff she wanted a divorce, a "breakdown of the relationship" began with the parties calling each other names, defendant giving plaintiff "the silent treatment," and plaintiff calling defendant's co-worker and commenting under his daughter's Instagram post, the court emphasized that plaintiff was the party who caused "the escalation of a certain type of behavior."

9

The court found that plaintiff was in a stronger financial position than defendant. Defendant moved out of state because she could no longer afford to live in New Jersey and, therefore, "had to relinquish residential custody of the . . . children."

Finding that "other [than] . . . plaintiff saying that she's afraid, there [was] nothing in the record which [gave] this [c]ourt reason to conclude that . . . defendant ha[d] exerted any power or control over . . . plaintiff, . . . or has the means or ability to do so in the future," the court denied the FRO.

In A.M.C. we reversed the denial of a FRO where the trial court found the defendant committed the predicate offense of assault, but nonetheless concluded that a FRO was unnecessary to protect the plaintiff. Id. at 422-23. There the trial court determined the plaintiff did not need ongoing protection because: (1) the defendant, who was unaware that a TRO was issued against him, had no desire to have a continuing relationship with the plaintiff and did not try to communicate with her after she left the marital home; (2) the parties did not have any children together; and (3) the plaintiff established only two instances of domestic violence, despite alleging many other, during the short nature of the parties' marriage. Id. at 411–12.

In reversing the trial court's decision, we found the parties' childlessness should not adversely affect the plaintiff's entitlement to injunctive relief. Id. at 415. We also found the defendant's conduct after the plaintiff left the marital home and the brevity of the parties' marriage were not relevant in deciding whether a FRO should be issued under the second prong of Silver. Id. at 416. The trial court's findings were "based more on speculation than evidence in the record" as there was "no rational basis for the [court] to use the duration of the marriage as a reliable predictor of [the] defendant's future conduct with [the] plaintiff" and the court "minimized one of the principal concerns that drove our analysis in Silver: [w]hether the predicate offense involved a violent act." Id. at 416.

Here, the parties had a lengthy relationship and two young children together, necessitating further contact between the parties. The children made the need for protection stronger and potential hazards of further violence more serious.

As in A.M.C., the trial court minimized the violent nature of defendant's actions. While it acknowledged that defendant "[c]ertainly" caused plaintiff injuries, the court explained it did "not find [plaintiff's] testimony credible as it relates to how the injuries occurred." The court noted that since plaintiff

repeatedly testified that she suffered from memory loss due to her concussion, "her memory [was] not exactly the most reliable." Although the court downplayed plaintiff's credibility and stated that defendant had been provoked prior to punching plaintiff, it found that defendant had committed two acts of domestic violence, including an assault that caused bruising and a head injury.

The court over-emphasized the lack of prior physical abuse between the parties. Although "domestic violence is ordinarily more than an isolated aberrant act," id. at 124 (quoting Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995)), and a history or pattern of abuse is a "classic characteristic of domestic violence," an order of protection may be granted "in the absence of such a pattern where there is 'one sufficiently egregious action,'" id. at 128 (quoting Cesare, 154 N.J. at 402). The court primarily denied the FRO because no history of domestic abuse existed. Although we defer to a family court's findings and credibility judgments, the court's denial of the FRO in these circumstances is contrary to the interests of justice and the purpose of the PDVA. Neither plaintiff's posting on Instagram, nor any other non-violent act justified defendant's physical violence.

Reversed. We remand only for the entry of a final restraining order and do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5354-18T1