908 A.2d 254

KATHERINE COLEMAN PLAINTIFF, v. KATHERINE ROMANO, DEFENDANT.

Superior Court of New Jersey
Chancery Division Family Part
Mercer County

Decided April 19, 2006.

344

_Patrick J. Whalen,_ for plaintiff.

_Jack L. Seelig,_ for defendant (_Seelig and Rednor,_ attorneys).

OSTRER, J.S.C.

This is the court's decision, after an evidentiary hearing, on defendant's motion to dismiss plaintiff's domestic violence complaint for lack of jurisdiction. The motion requires the court to determine whether the plaintiff Katherine Coleman, and her adult daughter, defendant Katherine Romano, are "former household members" under the statute, *N.J.S.A.* 2C:25–19(d), notwithstanding that they have not lived in the same house for almost thirty years. Based on their continuing, entangled relationship, the court finds that they are "former household members."

### *Procedural History.*

A resident of Mercer County, Ms. Coleman filed her domestic violence complaint November 15, 2005, after an incident that occurred in Bordentown Township on November 5, 2005. In her complaint, Coleman alleged that her daughter punched and kicked her, pushed her to the floor, and fractured some of her ribs. She also alleged that on October 13, 2005, Romano slapped her. A temporary restraining order was entered and a hearing was scheduled for November 29, 2005. The court adjourned the hearing to January 24, 2006, at defense counsel's request, maintaining all restraints. On January 24, 2006, the court granted a second adjournment at plaintiff's counsel's request and directed staff to relist the case on the next available date. The case was then scheduled for trial again on April 4, 2006.

At the outset of the hearing, defendant moved to dismiss for lack of jurisdiction on the ground that the parties were not former household members. The court heard argument and determined that an evidentiary hearing was required to resolve disputes over jurisdictional facts. The court heard testimony from the two parties.

### *Facts.*

The court finds the following facts by a preponderance of the evidence:

*The Mother and Daughter*

Ms. Coleman is sixty-eight years old. She lives in her own apartment in Mercer County. However, she spends roughly five days and nights a week with Manuel Lopez, who lives in Bordentown. Mr. Lopez and Ms. Coleman had a child, Debbie, forty-five years ago. They have maintained a relationship ever since, although Coleman obtained her own place about eighteen years ago. She testified that Lopez needed assistance in tasks of daily living and that she visited him, and stayed overnight, five days a week to help care for him. Their relationship is now a platonic one.

Romano is the oldest of Coleman's three daughters. Lopez is not her father, but she considers him her "step-father." She is a licensed practical nurse. She last lived in the same household with Coleman in 1977, before Romano married. She now lives in Hamilton Township with her second husband. Romano has a daughter Kristin, who gave birth to a son, Ian, in August 2005. Kristin lives with Ian's father, Andrew.

*The Relationship Pre–2004*

Coleman and Romano had a distant relationship after Romano left the family household in 1977. Romano did not even consistently share major holidays or birthdays or other special occasions with her mother.

Romano's first marriage of almost twenty years was marked by domestic violence. Romano ultimately left her first husband because of abuse. After she left the marital home, she spent a few days with Lopez. By then, Lopez was living separately from Coleman. Romano then moved in with one of her sisters. Romano's mother did not provide her shelter.

After the divorce, Romano moved several times. From the late 1990s to 2004, the mother and daughter communicated very little. They continued to celebrate holidays separately. They never shared the same household. Romano remarried in 2002. She invited her mother to the wedding, but her mother declined to attend. Coleman still has not met her daughter's second husband.

*Coleman Breaks Her Hip*

Then, in 2004, Coleman broke her hip. On the way to surgery, she called Romano to ask for help. Romano responded by visiting her in the hospital. She was the only one of Coleman's daughters to do so; reflecting an estranged relationship between Coleman and all her children. The reasons for this estrangement were not made clear. After the surgery and a stay at a rehabilitation center, Romano helped Coleman again. Although Romano did not stay with her mother overnight, she sometimes stopped by to cook meals or to bring medicine.

*Romano's Daughter Moves In With Lopez.*

Romano's twenty-five-year-old daughter Kristin gave birth to a boy, Ian, in August 2005. (Coleman testified erroneously that the child's name was Aaron.) Kristin, Ian, and Ian's father Andrew needed to relocate from their residence in New Egypt. Romano and Coleman each spoke to Lopez and persuaded him to allow the three to move into his single family house. According to their agreement, the three would live rent-free in the house's attic, which they were to clean out and upgrade. They had their own half-bathroom. In return for housing, Kristin agreed to cook and otherwise help Lopez with indoor chores, and her boyfriend agreed to keep up the yard and undertake other outdoor chores.

*Financial Relationship.*

The parties presented evidence regarding the nature of their financial relationship. They disputed the extent to which Coleman loaned or gifted money to her daughter over the years. The court finds that Coleman did provide some financial assistance to her daughter, including some loans. Romano was confronted with a document with her signature reflecting financial support from her mother of $1000.

In 2005, Romano informed her mother that she intended to move to Florida with her husband. She and her husband were going to buy a house that had yet to be built. Coleman transferred $15,000 to her daughter. The parties disputed the purpose

and form of the transfer. Romano testified that it was a gift. She alleged that her mother stated that she was pleased to see that her daughter was finally happy, and that she wanted her daughter to have the use of the money now, as opposed to after Coleman passed. Coleman, by contrast, explained that she paid the $15,000 to her daughter in return for a promise that she could stay at the house whenever she visited and that, when she was ready, she could move down and stay with her daughter. Both parties agreed that they designated a room on the floor plans of the new house for Coleman.

The court is persuaded that Coleman gave the $15,000 to her daughter with the expectation that she would be able to live in the house whenever she visited. While the court is not persuaded that the $15,000 was payment in full for permanent residence there, the court finds that both parties anticipated Coleman's regular and extended visits. A room was designated for her. This reflected a definite warming of the relationship between the mother and daughter. It also reflected an intention that Coleman would, at least on a temporary basis, share Romano's household in the future.

*Kristin's Stay With Lopez Leads to Domestic Violence Complaint.*

Romano stopped by every three or four days at Lopez's house to see her daughter Kristin and her grandson Ian. However, despite the warming of Romano's relationship with her mother, she did not stop to share a meal or socialize with Coleman. Rather, she would stop by, pick up Kristin and the child, and go off shopping or some other activity.

Eventually, however, Kristin, Andrew and the baby were asked to leave. The parties disputed whether this was a result of Lopez's dissatisfaction, or Coleman's. Disagreements arose between Coleman and Romano over Kristin's continued residence at Lopez's house. Ultimately, it was decided or mandated that Kristin, Andrew and the baby would leave. In connection with the move, Coleman alleges that there were two arguments or disputes

on two separate days. In one, Romano allegedly slapped her mother. In the second one, Romano allegedly assaulted her, breaking Coleman's ribs.

Since these incidents, Kristin and her mother have claimed that they are entitled to reimbursement for improvements to Mr. Lopez's house. On the other hand, Ms. Coleman seeks return of the $15,000.

### Discussion.

■ This court concludes that Coleman is protected under the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–17 to –34. The court will review the plain language of the statute, how the courts have interpreted it in a series of cases, and then apply the statute as interpreted to the facts in this case.

The Act protects people who are, or have been, involved in certain defined relationships with a perpetrator of domestic violence. Along with people who are married, co-parents, dating, and members of the same household, the Act covers former household members, and persons formerly in a dating relationship.

> "Victim of domestic violence" means a person protected under this act and shall include any person who is 18 years of age or older or who is an emancipated minor and who has been subject to domestic violence by ... any other person who is a present or former household member..... "Victim of domestic violence" also includes any person who has been subject to domestic violence by a person with whom the victim has had a dating relationship.
> [*N.J.S.A.* 2C:25–19(d)].

Taken on its face, "former household member" includes a person who shared a household at any time in his or her life, regardless of the time that has elapsed since, or the nature of the party's current relationship, or various other factors. However, it is now well-settled that "former household member" may not be read so broadly. *See Jutchenko v. Jutchenko,* 283 *N.J.Super.* 17, 20, 660 *A.*2d 1267 (App.Div.1995) (rejecting facial reading of "former household member" and finding no jurisdiction); *Sisco v. Sisco,* 296 *N.J.Super.* 245, 248–49, 686 *A.*2d 792 (Ch.Div.1996) (following *Jutchenko* and finding no jurisdiction). *Cf. Tribuzio v. Roder,* 356 *N.J.Super.* 590, 813 *A.*2d 1210 (App.Div.2003) (reject-

ing facial reading of "person with whom the victim has had a dating relationship," but finding jurisdiction); *Sperling v. Teplitsky*, 294 *N.J.Super.* 312, 321, 683 *A.*2d 244 (Ch.Div.1996) (following *Jutchenko*, and finding no jurisdiction in case of former dating relationship).

The rejection of a facial reading of the statute rests initially on the premise that domestic violence—the focus of the Act—is "a pattern of abuse or controlling behavior which is injurious to the victim." *Peranio v. Peranio*, 280 *N.J.Super.* 47, 52, 654 *A.*2d 495 (App.Div.1995). Not all acts of violence between former household members implicate that pattern of abuse or controlling behavior. Thus, the court in *Jutchenko v. Jutchenko*, *supra*, 283 *N.J.Super.* at 20, 660 *A.*2d 1267, held that the Act did not apply to alleged domestic violence between two middle-aged brothers. Although they were, technically, former household members, they had not lived in the same household for twenty years. Jurisdiction did not lie, "at least in the absence of any showing that the alleged perpetrators' past domestic relationship with the alleged victim provides a special opportunity for 'abuse and controlling behavior.'" *Ibid.* (*quoting Peranio v. Peranio*, *supra*, 280 *N.J.Super.* at 52, 654 *A.*2d 495). In a closely analogous case involving whether jurisdiction rested on a former dating relationship, the Appellate Division held that "[t]he ultimate issue is whether ... the victim was, at the time of the precipitating event, subject to potential abusive and controlling behavior related to and arising out of the past domestic relationship." *Tribuzio v. Roder*, *supra*, 356 *N.J.Super.* 590, 597, 813 *A.*2d 1210 (App.Div. 2003).

The *Jutchenko* and *Tribuzio* formulations differ subtly. *Jutchenko* looks forward in time, and focuses on whether the former relationship "provides a special opportunity" for domestic violence—thus triggering the need for protection and prevention in the future. *Tribuzio* to some extent looks backward, and focuses on whether the domestic violence was related to and arose out of the past domestic relationship. The approaches are comple-

mentary. Either kind of case can implicate the Act's remedial goals. Put another way, a court must inquire whether the parties have been so entangled, emotionally or physically—or they will be in the future—that the court should invoke the Act to protect the plaintiff and prevent future violence.

To resolve the jurisdictional question, the court in *Tribuzio v. Roder* held that mere passage of time is not enough to determine jurisdiction:

> The passage of time from the end of the dating relationship is only one factor to be considered in determining the availability of the Act's protection. The extent and nature of any intervening contacts as well as the nature of the precipitating incident must also be considered... A qualitative analysis is required, weighing and balancing the nature and duration of the prior relationship, the intervening contacts, the nature of the precipitating event, and any other appropriate factors. [356 *N.J.Super.* at 597, 813 *A.*2d 1210].

Among "other appropriate factors" that courts have considered is the likelihood of ongoing contact. Thus, in *Sperling v. Teplitsky, supra,* 294 *N.J.Super.* at 320, 683 *A.*2d 244, a case involving a former dating relationship, the court declined jurisdiction where "such persons can reasonably expect that there will be no need for them ever to come in contact." By contrast, the court in *Storch v. Sauerhoff,* 334 *N.J.Super.* 226, 234–35, 757 *A.*2d 836 (Ch.Div.2000), found jurisdiction based on the "hybrid of two jurisdictional grounds: 'present household member' and 'former household member,' " where the parties had to "interact on a frequent basis." This is consistent with the notion expressed in *Jutchenko* that the relationship must create a "special opportunity" for abuse.

In summary, based on the foregoing, there are at least six factors to consider in determining whether jurisdiction lies in a former relationship case:

(1) the nature and duration of the prior relationship;

(2) whether the past domestic relationship provides a special opportunity for abuse and controlling behavior;

(3) the passage of time since the end of the relationship;

(4) the extent and nature of any intervening contacts;

(5)  the nature of the precipitating incident;  and

(6)  the likelihood of ongoing contact or relationship.

█  In weighing the above factors, a court should find that proof of a close and long-lasting relationship, as opposed to a short-lived and casual one, tends to support jurisdiction.  As the court concluded in *Jutchenko,* if the past relationship provides no opportunity for violence, that would also weigh against jurisdiction. Thus, in *Sisco v. Sisco, supra,* 296 *N.J.Super.* at 246–47, 249, 686 *A.*2d 792, the court found no jurisdiction over an adult daughter's complaint against her father, from whom she was once estranged, but then reconciled, where the parties lived independently of each other, and the plaintiff alleged an assault arising out of an argument involving the care of another family member. On the other hand, jurisdiction was found in *Storch v. Sauerhoff, supra,* 334 *N.J.Super.* at 234, 757 *A.*2d 836, where the court found that "the parties ... have a long standing familial and emotional relationship which the plaintiff alleges has been characterized by controlling and verbal abuse."

█  A short hiatus between the end of the relationship and the present incident favors the jurisdictional claim.  *Compare Jutchenko v. Jutchenko, supra,* 283 *N.J.Super.* at 20, 660 *A.*2d 1267 (jurisdiction rejected where hiatus was twenty years) and *Sisco v. Sisco, supra,* 296 *N.J.Super.* at 249, 686 *A.*2d 792 (jurisdiction rejected where hiatus was fifteen years), *with Tribuzio v. Roder, supra,* 356 *N.J.Super.* at 597, 813 *A.*2d 1210 (jurisdiction found where hiatus was three years).  *But see Storch v. Sauerhoff, supra,* 334 *N.J.Super.* at 234–35, 757 *A.*2d 836 (jurisdiction found despite a nineteen-year hiatus, although court grounded its decision on a finding that a hybrid of both present and former household relationship existed).

█  Business contacts are less significant than family or domestic-related contacts.  *See Sperling v. Teplitsky, supra,* 294 *N.J.Super.* at 316, 321, 683 *A.*2d 244 (no jurisdiction where defendant kicked plaintiff's current boyfriend's car over business dispute

unrelated to plaintiff). Also, more numerous contacts strengthen the jurisdictional claim. *See Tribuzio v. Roder, supra,* 356 *N.J.Super.* at 597, 813 *A.*2d 1210 (jurisdiction established where "unwanted contacts ... were frequent and their nature demonstrated a continuing emotional attachment on defendant's part and an effort to control plaintiff's behavior and to harass her").

Intervening contacts marked by violence or threats also strengthen the jurisdictional claim, and absence of violence weakens it. *See Sperling v. Teplitsky, supra,* 294 *N.J.Super.* at 321, 683 *A.*2d 244 (no jurisdiction where only one contact between plaintiff and defendant since end of dating relationship in late 1991 and incident January 1996). If the precipitating incident relates to the domestic relationship, then jurisdiction is more appropriate than if the precipitating incident had no connection to a domestic setting or relationship. *Compare Tribuzio v. Roder, supra,* 356 *N.J.Super.* at 597, 813 *A.*2d 1210 (jurisdiction established where contacts related to prior dating relationship), *with Sperling v. Teplitsky, supra,* 294 *N.J.Super.* at 316, 320, 683 *A.*2d 244 (incident related to defendant's business dealings with plaintiff's current boyfriend). Lastly, as noted above, the likelihood of ongoing contact favors jurisdiction.

Applying these factors to the case at hand, the court is generally guided by the legislative intent that the Act be broadly applied and liberally construed. *See N.J.S.A.* 2C:25–18 ("the Legislature ... encourages the broad application of the remedies available under this act"). This has been invoked to support liberal construction of the jurisdictional provisions of the Act. *See, e.g., Bryant v. Burnett,* 264 *N.J.Super.* 222, 225–26, 624 *A.*2d 584 (App.Div.1993) (invoking *N.J.S.A.* 2C:25–18 in finding jurisdiction based on household membership); *Desiato v. Abbott,* 261 *N.J.Super.* 30, 32–33, 617 *A.*2d 678 (Ch.Div.1992) (same). *See also Cesare v. Cesare,* 154 *N.J.* 394, 400, 713 *A.*2d 390 (1998) (stating that the Act should be liberally construed).

The court will therefore consider each of the six factors identified above.

*The nature and duration of the prior relationship.* Coleman and Romano lived together as mother and daughter until Coleman's marriage. This was a long prior relationship. This was not a case of two people who briefly shared a household as roommates. *Compare Hamilton v. Ali,* 350 *N.J.Super.* 479, 795 *A.2d* 929 (Ch.Div.2001) (act covers college suitemates as household members). While such arrangements warrant jurisdiction while they exist, they may not create durable emotional ties warranting jurisdiction many years after the household arrangement ended. However, in this case, feelings and complex interrelationships had considerable time to form and take root. It was not always a happy relationship. Although the court is in no position to untangle the web of psychological and emotional connections between mother and daughter, it is clear that Romano's years in her mother's household left a lasting and durable mark on her and her mother. These facts favor a finding of jurisdiction.

*Whether the past domestic relationship provides a special opportunity for abuse and controlling behavior.* The past household relationship provides a special opportunity for "abuse and controlling behavior." When Coleman broke her hip and needed help, the mother-daughter relationship was strong enough to bridge the gap between the two that had developed over the years. Coleman had some level of trust and confidence in her daughter. Whether Romano was motivated by love or a sense of obligation, she responded. She had access to the privacy of her mother's home when she recuperated. She also had access to Lopez's home, when visiting Kristin and her family. Ironically, the past domestic relationship that Coleman relied upon for help, and was strengthened thereafter, gave Romano an opportunity to abuse or control her mother. By contrast, if the parties had been mere college roommates thirty years before, it is unlikely that Coleman would have called upon Romano or that Romano would have responded.

*The passage of time since the end of the relationship.* The passage of time since the end of the household relationship has been long—almost thirty years. Yet, the familial relationship

between the parties continued, and, since 2004, had become closer and more involved. As noted by the court in *Tribuzio v. Roder, supra*, 356 *N.J.Super.* 590, 813 *A.2d* 1210, the mere passage of time is not enough to deny a plaintiff protection under the Act.

*The extent and nature of any intervening contacts.* The intervening contacts between the parties became more frequent and significant. True, there was a period of time when the parties hardly spoke. However, a significant change in the relationship followed Coleman's hip injury. The contacts thereafter "demonstrated a continuing emotional attachment" between the parties. *Tribuzio v. Roder, supra*, 356 *N.J.Super.* at 597, 813 *A.2d* 1210.

There are obvious peculiarities in each party's relationship to the other. On one hand, Romano did not socialize with her own mother, despite numerous visits to Lopez's house when her mother was there. On the other hand, Romano nursed her mother after her hip injury, and reserved a room for her mother in her future home in Florida.

On one hand, Coleman still had not even met Romano's second husband, and could not even correctly name her great-grandson. On the other hand, she transferred or gifted $15,000 to her daughter, and loaned other money to her. And both Coleman and Romano cooperated in helping Kristin find shelter in Lopez's house.

The intensification of contacts between the two parties favors a finding of jurisdiction. These are two parties whose affairs became increasingly entangled. While they no longer lived in the same household, they were in the same house—Mr. Lopez's—once or twice a week. They planned to be under the same roof in Florida. They both had intervened in the household arrangements for Kristin, Coleman's granddaughter and Romano's daughter.

The intervening contacts have some of the indicia of a current household relationship, although the court need not decide whether one exists, given the conclusion that the parties are former

household members covered by the Act. The courts have held that parties need not necessarily sleep under the same roof every night to constitute a household, if interactions are frequent, in a family setting, and other factors are present. For example, in *South v. North,* 304 *N.J.Super.* 104, 698 *A.*2d 553 (Ch.Div.1997), the court found a present household relationship where defendant formerly dated plaintiff, currently dated plaintiff's daughter with whom he fathered a child, and lived in the same apartment complex. He frequently visited the home of plaintiff, her daughter and his son, let himself in, cooked and shared meals often, stayed for long periods, and overnighted there when plaintiff was not present.

In *Storch v. Sauerhoff, supra,* 334 *N.J.Super.* at 235, 757 *A.*2d 836, the court followed *South v. North,* and found a de facto household relationship between plaintiff-step-daughter and defendant-step-mother. The parties lived in separate houses on the same block. Also living in a separate house on the same block was defendant's daughter and her children. The parties interacted frequently. The defendant often visited her daughter's home, directly to the rear of plaintiff's, to be with her grandchildren by her natural daughter. Although defendant infrequently visited plaintiff's home, she attended various family and religious functions there and occasionally cared for plaintiff's children.

The facts in this case do not match the level of entanglement in either *South v. North* or *Storch v. Sauerhoff.* Romano's visits to Lopez's home were not as frequent; nor did she interact with her mother as much as the parties in the other cases. Nor does Romano live in her own house just a stone's throw from her mother, as the parties did in *Storch v. Sauerhoff.* Nonetheless, the commonalities between those two cases and this one reflect the substantial nature of the intervening contacts. Even if they do not amount to a current household relationship, they add substance to the former household relationship and lend support to a finding of jurisdiction.

*The nature of the precipitating incident.* The precipitating incident involved a domestic relationship—the living arrangements

of Kristin, her boyfriend, and her infant son. There was a disagreement over whether Kristin's family should remain in Lopez's house. Romano claimed that Kristin was capably caring for Lopez, as agreed, and that Coleman resented that, and instigated her move. Coleman claimed that Kristin had failed to cook meals for Lopez and that the arrangement was not working out. Without resolving whose version is correct, it is clear that the precipitating disagreement arose out of a domestic relationship.

Concededly, the allegations of violence all pertain to Kristin's living arrangements and do not form a pattern of conduct. Nonetheless, they are, if proved, sufficiently egregious to implicate the Act. In one instance, Romano allegedly slapped her mother; in the second, she allegedly kicked and punched her and broke some of her ribs. Although domestic violence has been equated with a "pattern of abuse or controlling behavior," *Peranio v. Peranio, supra,* 280 *N.J.Super.* at 52, 654 *A.2d* 495, and "ordinarily [is] more than an isolated aberrant act," *id.* at 54, 654 *A.2d* 495, a single, sufficiently egregious action may trigger the Act. *Cesare v. Cesare, supra,* 154 *N.J.* at 402, 713 *A.2d* 390 ("a court is not obligated to find a past history of abuse"). That would apparently be so in this case, if the proofs support Coleman's complaint.

*The likelihood of ongoing contact or relationship.* Despite the bitter feelings that now exist between the parties, it appears likely that they will continue to have contact. They have civil claims against each other arising out of Coleman's $15,000 transfer and the claim that Kristin is entitled to reimbursement. It is clear that Coleman remains committed to assisting Lopez. On the other hand, Romano may also feel a sense of obligation to assist Lopez because of his relationship to her. He is ailing. He needs help in tasks of daily living. He helped her in the past and recently helped her own daughter. Although there seems little prospect that Coleman will be visiting Romano in her future home in Florida, there are still opportunities for the parties to interact, which implicate a need for protection, if it is ultimately found that domestic violence was committed.

In conclusion, the court finds, based on its analysis of the above factors, that jurisdiction lies. Aside from the length of time since the parties shared a household, all the other factors point in favor of jurisdiction. Coleman and Romano continue to be entangled in the kind of emotional and family relationship that the Act was intended to cover. Romano and her mother are properly deemed "former household members." If the allegations of domestic violence are proved, then Coleman would be a "victim of domestic violence" in need of ongoing protection under the Act.

The motion to dismiss for lack of jurisdiction is therefore denied. Consistent with the court's prior order, the parties and counsel shall appear for the hearing on the merits of the domestic violence complaint.