# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1548-18T2

M.S.,[1]

      Plaintiff-Respondent,

v.

D.H.,

      Defendant-Appellant.

_____

Submitted January 23, 2020 – Decided March 25, 2020

Before Judges Koblitz and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FV-14-0267-19.

Deininger & Associates, LLP, attorneys for appellant (Christopher L. Deininger, on the briefs).

Laddey, Clark & Ryan, LLP, attorneys for respondent (Thomas N. Ryan, on the brief).

---

[1] We employ initials to protect the privacy of the domestic violence victim. R. 1:38-3(d)(10).

PER CURIAM

Defendant appeals from an October 30, 2018 final restraining order (FRO) entered against him in favor of plaintiff pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  We affirm.

Plaintiff hired defendant as a caregiver for his twenty-three-year-old autistic son, J.S., who was prone to violent outbursts.  In his role as caregiver, defendant lived with plaintiff and J.S. from August 2017 to August 2018, when plaintiff terminated defendant's employment due to disagreements between the parties.

On October 5, 2018, plaintiff filed a complaint against defendant, seeking a restraining order under the PDVA, alleging defendant committed acts of domestic violence, specifically harassment, N.J.S.A. 2C:33-4.  In the complaint, plaintiff alleged that on October 1, 2018, when he went to defendant's residence to retrieve a laptop, defendant told plaintiff that if they did not resolve their disagreements, "[plaintiff] will die."  Plaintiff also alleged that on September 29, 2018, during a meeting with J.S.'s psychiatrist, defendant told plaintiff that "[plaintiff] could have been dead by now" and showed him "a collage of death and destruction."  According to plaintiff, "[defendant] has weapons and was a former black ops."

A-1548-18T2

Additionally, in the complaint, plaintiff reported a prior history of domestic violence. Plaintiff alleged that in June and July of 2018, defendant walked into his bedroom and "threaten[ed] to harm [him]," and, since August 2018, plaintiff received "dozens [of] phone[] calls" from defendant, demanding "[four] million dollars," a "[twenty-]year emp[lo]yment contract," and "life[]time benefits." Plaintiff also asserted that defendant "pressured [him] into buying a property that has caused [him] financial hardship."

On October 9, 2018, both parties appeared pro se for a final hearing. After the Family Part judge explained the ramifications of an FRO, he granted defendant's request for a two-week adjournment to obtain counsel or prepare "a reply to the allegations." When the parties returned on October 18, 2018, the judge granted an additional one-week adjournment for defendant to obtain counsel. At the final hearing conducted on October 30, 2018, plaintiff was represented by counsel while defendant remained self-represented. During the hearing, in addition to his testimony, plaintiff produced his now ex-wife, Ji.S., as a witness. For the defense, in addition to his testimony, defendant produced a neighbor and a friend to testify on his behalf.

We summarize the relevant testimony. Plaintiff is "the main principal" in "a financial firm." He testified that he hired defendant as "a compensated

caregiver" for his son, who has been declared "partially incapacitated by the [c]ourts," and for whom he and Ji.S. have "a limited guardianship." According to plaintiff, hiring defendant "allow[ed him] to be . . . at work . . . , rather than having to be home with [his] son." Initially, defendant and J.S. lived in defendant's Morristown home for "approximately a year and a half."[2] However, after J.S. had "an altercation" with one of defendant's neighbors, which resulted in the neighbor obtaining "a restraining order against [J.S.]," defendant and J.S. moved into plaintiff's Newton home in "early August of [2017]."

From that point, the parties' relationship had its ups and downs. At times, plaintiff supported and publicly praised defendant for the positive impact he had on J.S. Plaintiff and defendant even agreed to participate in a joint venture for which plaintiff purchased property (the property), where defendant and J.S. would eventually reside and operate "a 501(c) nonprofit organization" for individuals on the autism spectrum like J.S. Other times, J.S.'s violent tendencies erupted in physical attacks, including interactions that resulted in

---

[2] The two initially met "on a dating site" on the internet. They dated for a short time until defendant "recognized that there was something different about [J.S.]" Despite discontinuing their "romantic relationship," defendant testified J.S. continued to come back to his house and ultimately moved in about four weeks after they first met.

A-1548-18T2

defendant suffering serious injuries.[3]  According to plaintiff, ultimately, the parties' relationship deteriorated to the point where defendant "became very abusive towards [plaintiff]."  Plaintiff testified there were times when defendant would be "physically aggressive," and times when he would be "very passive aggressive," "very manipulative," and "controlling," making "implied threat[s]."

Plaintiff testified about "two occasions" in particular, one in June and the other in July, 2018, when defendant "just walked into [his] [bed]room in the middle of the night" and "yell[ed] at [him]" in a "very hostile" manner.  While defendant's tirade during the June incident was unintelligible, during the July incident, defendant threatened that if plaintiff did not "move on . . . [their] plans" for "the 501(c)," there "will be a very harmful situation" and "things will go horribly wrong."  Plaintiff testified that "at that point it was obvious to [him] that [defendant] was weaponizing [his] son against [him]" by "[i]nfluencing him to be hostile towards [him]."[4]  Plaintiff described the experiences as "very frightening."  He stated defendant appeared "intoxicated" on both occasions, and eventually left the bedroom at plaintiff's request.

---

[3]  According to defendant, as a result of J.S.'s violent attacks, he suffered "[t]wo detached retinas, an infarction in [his] brain, and a missing spleen."

[4]  Defendant acknowledged "that [J.S.] is influenced by anybody he trusts."

5

As the relationship continued to deteriorate, the parties agreed that defendant and J.S. would move out, but "[t]hey did not." Instead, plaintiff testified that in mid-August, 2018, defendant made "dozens" of "very hostile and aggressive phone calls to [him]," making various demands, including demanding "$4 million[,] a [twenty-]year employment contract, . . . lifetime benefits," and completion of "renovations that were being done at the property." According to plaintiff, the property "[had] problems," the renovations were costing a lot more money than he had anticipated, and defendant had reneged on his pledge "to sell [his Morristown] home" and "put cash equity into [the] property."

When defendant continued to make these demands, on August 29, 2018, plaintiff told defendant "[w]e are done," terminated his employment, and told him "to leave [his] home right now." When defendant refused to leave, plaintiff called the police for assistance in removing defendant from his home. J.S. followed defendant and resumed residing with him in his Morristown home.

About three weeks later, on September 29, 2018, defendant arranged for a family meeting with J.S.'s psychiatrist, purportedly "to see . . . how [they could] be amicable in [the] situation." Plaintiff, Ji.S., J.S., and defendant attended the meeting. According to plaintiff, during the meeting, defendant

6

produced two collages that had been created by J.S. from magazines and catalogues.[5] Plaintiff described one collage as depicting "doom, gloom, death, [and] destruction,"[6] and the other as "happiness and utopia." Referring to the "happiness and utopia" collage, defendant told plaintiff "we need to put this back together again" and "you need to continue to . . . compensate me so we can move forward to this." Referring to the "doom and gloom" collage, defendant told plaintiff "you could be dead by now."

Ji.S. confirmed plaintiff's account of what transpired during the meeting in J.S.'s psychiatrist's office, and testified she felt "physically threatened" by defendant's actions as well. She testified that during the meeting, defendant also gestured by pounding on his chest, while looking aggressively towards plaintiff. On cross-examination, Ji.S. acknowledged that defendant said "I love you, I love you all" while pounding on his chest. However, she did not "process" defendant's threatening gestures as a way of "reaching out" for peace.

Plaintiff "interpreted" defendant's actions at the meeting as a threat "that if [he] did [not] succumb to [defendant's] demands and continue the arrangement

---

[5] Both collages were moved into evidence.

[6] The "doom and gloom" collage depicted at least one "character with his eyes gouged out."

that [he] could be dead." Plaintiff was "disturb[ed]," and "frighten[ed]" because defendant had told him that he was "ex-military," "highly trained," and "had weapons." In fact, when plaintiff first met defendant, defendant showed him "[a] very large gun locker" at his home containing both "handguns and . . . long guns."[7]

On October 1, 2018, the Monday following the Saturday meeting at J.S.'s psychiatrist's office, plaintiff went to defendant's home "to retrieve [his] laptop" that J.S. had removed when he left plaintiff's home. When plaintiff arrived, defendant "was sitting on his front porch waiting for [him]" with "the same [two] collages" from the psychiatrist's office. Defendant "suggested [they] take a walk down to the bank." When plaintiff "refused," defendant stated "if we don't resolve this you will die."

In his defense, defendant did not deny the statements attributed to him but disagreed that they were made "for extortion" or constituted "threat[s] of violence." Instead, defendant explained that his statements that he will "kill [plaintiff]" or that plaintiff "will be dead" were for "protection." Defendant testified he was attempting to prevent plaintiff and J.S. from inflicting harm on

---

[7] While serving the temporary restraining order (TRO) on defendant, law enforcement officers removed about twelve handguns, long guns, and knives from his home.

each other because he believed they were not "likely to survive [being together] unharmed." Defendant claimed his "demand for $4 million and [twenty] years of employment" was "a benign threat" "to sue" for just compensation for the "lifetime injuries" and "lifetime disabilities" he suffered from J.S.'s attacks while in plaintiff's employ. Defendant testified plaintiff's only motive in filing for the restraining order was "to suppress [his] whistleblowing claims,"[8] and prevent him from pursuing his "workplace injury," "workplace negligence," and "wrongful termination" lawsuits against plaintiff.

Defendant testified that after he demanded "some kind of stipend" and "$10,000 in expenses" from plaintiff as compensation for J.S. living with him after they moved out of plaintiff's home, plaintiff responded by "put[ting] a restraining order on [him]." Defendant also testified "that just because [plaintiff] was losing his nerve on the [501(c)] project didn't mean that . . . [defendant] would just disappear out of convenience, though that is what . . . th[e] restraining order [was] aimed to do." Defendant disputed plaintiff's claim that he felt threatened by or fearful of defendant as inconsistent with plaintiff's actions in participating with defendant in "at least two dozen shoulder to

---

[8] Defendant alleged plaintiff committed various forms of fraud and misconduct related to him claiming defendant as an employee of plaintiff's firm while he was employed as J.S.'s caregiver.

shoulder collaborat[ive], multi-day projects," and "attend[ing] several social events together" in July 2018, after the alleged nighttime bedroom encounters.

While defendant acknowledged his "extensive education, training and experience in applied behavioral sciences," including "[a] bachelor[']s and two master[s'] degrees," his military background, including graduating "in the top three percent of [his] class" from the "United States Military Academy at West Point," and his arsenal of weapons, defendant characterized himself as "a peacemaker," "somebody who . . . cares about others, and who is simply not violent." He testified that it was plaintiff, rather than he, who exhibited physically aggressive characteristics. In support, defendant's neighbor testified about defendant's professional background, the positive impact he had on J.S., and an incident she witnessed while defendant was hospitalized for one of his injuries, during which plaintiff was "yelling" at defendant. Additionally, defendant's friend testified about defendant's non-threatening nature as well as the positive impact he had on J.S.

Following the hearing, the judge granted the FRO. In an oral opinion, the judge first assessed whether the court had "jurisdiction over the subject matter and the parties," acknowledging that "defendant's questioning" appeared to be "contesting [whether] he was [plaintiff's] household member." Citing the six

factors delineated in <u>Coleman v. Romano</u>, 388 N.J. Super. 342, 351 (Ch. Div. 2006), for consideration "in determining whether jurisdiction lies in a former relationship case,"[9] the judge concluded the parties qualified as former household members to confer jurisdiction under the PDVA.

In support, the judge explained the parties "lived in the same household for a year and . . . defendant was a caretaker for . . . plaintiff's son," "[i]t was

---

[9] The six factors are:

> (1) the nature and duration of the prior relationship;
>
> (2) whether the past domestic relationship provides a special opportunity for abuse and controlling behavior;
>
> (3) the passage of time since the end of the relationship;
>
> (4) the extent and nature of any intervening contacts;
>
> (5) the nature of the precipitating incident; and
>
> (6) the likelihood of ongoing contact or relationship.
>
> [<u>Id.</u> at 351-52.]

The court expounded that "proof of a close and long-lasting relationship, as opposed to a short-lived and casual one," a past relationship "characterized by controlling and verbal abuse," "[a] short hiatus between the end of the relationship and the present incident," "more numerous contacts," "[i]ntervening contacts marked by violence or threats," a "connection" between "the precipitating incident" and "the domestic relationship," and "the likelihood of ongoing contact" tend "to support jurisdiction." <u>Id.</u> at 352-53 (citations omitted).

A-1548-18T2

only a couple of weeks between the end of the relationship as household members, and the institution of the [TRO]" proceedings, and "there [were] multiple intervening contacts from the time . . . defendant left . . . plaintiff's residence until the [TRO] was issued." Further, "[t]he nature of the precipitating incident was directly related to the contacts between the parties and . . . plaintiff's son," and although "currently defendant does [not] characterize himself as a caretaker, he is providing shelter, and support for plaintiff's son," thus implicating a "likelihood of ongoing contact" in the future.

Next, the judge considered whether "a predicate act of domestic violence" was committed by defendant and proven by plaintiff "by a preponderance of the evidence." In that regard, the judge "found [plaintiff] to be credible," because "[h]is demeanor throughout was credible to the [c]ourt," "[h]is recollection was good and accurate with respect to events, and his testimony was consistent." Similarly, "based on her demeanor," the judge found Ji.S.'s testimony "to be very credible."

The judge recounted that plaintiff identified "two incidents in particular that form[ed] the basis of the complaint," the September 29 and the October 1, 2018, incident. During the September 29 incident, which was corroborated by Ji.S.'s testimony, while referring to the "gloom and doom collage" during a

meeting with J.S.'s psychiatrist, defendant told plaintiff in relation to his unmet "demands" for continued compensation that "[plaintiff] could be dead by now." During the October 1 incident, when plaintiff "went to collect his laptop from . . . defendant's house," defendant "said if we do not resolve this, you will die." The judge also referred to plaintiff's testimony "about incidents in July and June of 2018," which plaintiff "tried to get past," during which "defendant came into . . . plaintiff's bedroom, and was verbally abusive."

Turning to the defense, while the judge did not have "any concerns" with the credibility of defendant's neighbor or friend, the judge pointed out that their testimony was not particularly "relevant" or "directly related to the issues in th[e] case." On the other hand, "[w]ith respect to . . . defendant," the judge did not "find [him] to be credible mainly because of [his] argumentative nature and the way he responded to questions," noting that defendant "was unable to answer questions directly" and "some of [his] testimony just . . . did [not] make sense to the [c]ourt."

The judge rejected defendant's explanation that his statements were "meant as protection, not a threat." In recounting defendant's testimony, the judge stated

> defendant also testified that while he's not a physical threat, he believes plaintiff brought this action because

13

he was threatening to bring a whistleblowing action, as well as liability for workplace injury and negligence, which then made . . . defendant a threat to . . . plaintiff.

. . . [P]laintiff had testified that defendant threatened him and said you need to . . . pay me $4 million, give me employment for [twenty] years, and provide me benefits for the rest of my life, . . . or if we don't resolve this you will die. Defendant maintains that's not what happened at all, so, wrong context. He . . . just made suggestions that ways to resolve this after he's been terminated were to give him [twenty] years of employment or payment of $4 million, which would be the present value of that [twenty] years of work. It was meant . . . to convey hear me, and help me, and just because plaintiff was losing his nerve defendant won't disappear out of convenience.

. . . .

Defendant testified he helps [J.S.] to make smart choices, but he doesn't control him. Defendant conceded he's not trained as a psychiatrist or psychologist. . . . Defendant further testified [J.S.] does not insist on being with defendant, it's just [J.S.'s] choice.

Ultimately, the judge concluded that "[b]ased on the testimony of the parties, and the evidence submitted,"

plaintiff has proven, by a preponderance of the evidence that . . . defendant committed the predicate act of harassment under [N.J.S.A.] 2C:33-4(a) with respect to offensively [coarse] language or any other manner likely to cause annoyance or alarm, specifically the threats . . . with respect to plaintiff's safety at the

meeting [at J.S.'s psychiatrist's office], and . . . when . . . plaintiff picked up his laptop.

Regarding plaintiff's "fear for his safety," and "his well-being . . . without the restraining order being issued," the judge noted "there [has] been testimony about . . . defendant's training in the military," and "the fact that defendant had weapons." The judge found such testimony "to be relevant to the fact that [defendant] had access to weapons that could be used against . . . plaintiff." In conjunction with the prior incidents of domestic violence in June and July 2018, the judge determined that "plaintiff's life, health or well-being will be endangered without the [FRO] being entered," and, accordingly, "enter[ed] a [FRO]" against defendant, which included Ji.S. as "a protected party." This appeal followed.

On appeal, defendant raises the following points for our consideration:

POINT I

THE LOWER COURT'S FRO SHOULD BE VACATED [AND] DISMISSED ON APPEAL FOR LACK OF DOMESTIC VIOLENCE JURISDICTION REVIEW.

POINT II

THE FRO SHOULD BE VACATED AND/OR DISMISSED, DUE TO THE MANNER IN WHICH THE FRO HEARING WAS CONDUCTED, WHICH DENIED [DEFENDANT] DUE PROCESS OF LAW.

15

A. [DEFENDANT] SHOULD HAVE BEEN OFFERED AN ADJOURNMENT TO SECURE COUNSEL TO APPEAR AND DEFEND HIM, BASED UPON THE LAST-MINUTE, SURPRISE APPEARANCE BY [PLAINTIFF'S] ATTORNEY.

B. DUE PROCESS WAS DENIED BY [PLAINTIFF]'S PRESENTATION OF MATTERS AND ISSUES OUTSIDE THE FOUR-CORNERS OF THE TRO SERVED UPON [DEFENDANT].

1. SURPRISE ALLEGATIONS OF "WEAPONIZING" [J.S.]

2. NEW ALLEGATIONS OF "FINANCIAL ABUSE"

3. DUE PROCESS WAS DENIED BY THE LOWER COURT'S FAILURE TO ARTICULATE SUFFICIENTLY ITS FACTUAL FINDINGS [AND] LEGAL CONCLUSIONS, BASED ON THE RECORD

POINT III

THE FAILURE TO REQUIRE TESTIMONY FROM [J.S.'S PSYCHIATRIST] [AND] [J.S.], AND FAILURE TO REQUIRE PRESENTMENT OF THE VARIOUS RECORDINGS AND OTHER AVAILABLE EVIDENCE DISCLOSED TO EXIST DURING THE FRO HEARING, VIOLATED [N.J.S.A.] . . . 2C:25-29 AND NECESSITATES RELIEF FROM THE FRO.

16

POINT IV

BASED UPON THE RECORD BELOW, [PLAINTIFF] FAILED TO CARRY HIS PROOF BURDEN [AND] PLAIN ERROR OCCURRED DUE TO THE FAILURE TO ADDRESS [DEFENDANT'S] "ULTERIOR MOTIVE" DEFENSE.

A. THE "ULTERIOR MOTIVE" DEFENSE

B. THE WEIGHT OF THE EVIDENCE WAS AGAINST [PLAINTIFF]

"We have a strictly limited standard of review from the fact-findings of the Family Part judge." R.L.U. v. J.P., 457 N.J. Super. 129, 134 (App. Div. 2018) (quoting N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010)). Because Family Part judges have the "opportunity to make first-hand credibility judgments about the witnesses who appear[] on the stand," ibid., and "possess special expertise in the field of domestic relations," we defer to their factual findings. Cesare v. Cesare, 154 N.J. 394, 412-13 (1998).

Therefore, when considering an FRO issued by the Family Part, we "grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We may, however, disturb the trial court's findings if we are "convinced

17

that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). On the other hand, questions of law are reviewed de novo. R.L.U., 457 N.J. Super. at 134.

To obtain an FRO, the plaintiff must prove by a preponderance of the evidence that: (1) he or she "has been subjected to domestic violence by a spouse, former spouse, or any other person who is a present household member or was at any time a household member," N.J.S.A. 2C:25-19(d); (2) "one or more of the predicate acts set forth in [N.J.S.A. 2C:25-19(a)] has occurred," Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006); and (3) based "upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29a(1) to -29a(6)," a restraining order "is necessary . . . to protect the victim from an immediate danger or to prevent further abuse," id. at 127.

Defendant challenges the judge's findings on all three elements. As to the first element, defendant argues "[t]he evidence . . . failed to establish that [he] ever qualified as a 'household member' – past or present – of [plaintiff]," because "at all relevant times[, he] maintain[ed] his own home in Morristown," "kept his belongings at his Morristown home," and "stayed most overnights at his

Morristown home." Defendant asserts that he and plaintiff "were only ever in an employer-employee relationship, a relationship devoid of the dynamics, complexities, and emotions of familial relationships," and "none of the case law cited by the [trial] court applied domestic violence jurisdiction to an employer-employee relationship."

The PDVA "and its legislative history confirm that New Jersey has a strong policy against domestic violence." Cesare, 154 N.J. at 400. "Initially enacted in 1991, the [PDVA] has been amended on several occasions, to increase the scope of those who fall within its protective sweep." J.D. v. M.D.F., 207 N.J. 458, 473 (2011). Because the PDVA "is remedial in nature," it "should be construed liberally, giving [its] terms the most expansive reading of which they are reasonably susceptible." N.G. v. J.P., 426 N.J. Super. 398, 409 (App. Div. 2012) (citing Donelson v. DuPont Chambers Works, 206 N.J. 243, 256 (2011)).

"In determining whether a defendant is a 'former household member' under the [PDVA], the inquiry should be whether the 'perpetrator's past domestic relationship with the alleged victim provides a special opportunity for abusive and controlling behavior.'" Ibid. (quoting Tribuzio v. Roder, 356 N.J. Super. 590, 595 (App. Div. 2003)). In making that determination, in N.G., we adopted the "six-factor test" enunciated in Coleman, "focusing on 'whether the parties

have been so entangled, emotionally or physically—or they will be in the future—that the court should invoke the [PDVA] to protect the plaintiff.'" Id. at 410 (quoting Coleman, 388 N.J. Super. at 351).

Here, we agree with the judge's application of the Coleman factors and conclusion that plaintiff was a protected party under the PDVA. Contrary to defendant's assertion, the absence of a traditional familial relationship and the presence of an employer-employee relationship do not disqualify the victim from seeking relief under the PDVA. In S.Z. v. M.C., the defendant, an employee of the plaintiff's renovation business who needed a place to live, was considered a "household member" for purposes of the PDVA after living with the plaintiff for seven months, despite the absence of "a traditional familial, romantic or sexual relationship." 417 N.J. Super. 622, 625 (App. Div. 2011) (quoting N.J.S.A. 2C:25-19(d)).

Further, in J.S. v. J.F., we stated:

> Indeed, an au pair or live-in housekeeper would undoubtedly qualify as a "person who is a present or former household member," [N.J.S.A. 2C:25-19(d)], entitled to relief under the [PDVA], even though that person might be a member of the household only because compensation has been paid for his or her presence. The fact that a person receives a monetary benefit from engaging in a relationship does not automatically disqualify that person from the Act's benefits.

[410 N.J. Super. 611, 615 (App. Div. 2009).]

See also E.S. v. C.D., 460 N.J. Super. 326, 329 (Ch. Div. 2018) (holding that despite the economic relationship, a live-in nanny is considered a former household member under the PDVA). Here, notwithstanding the economic relationship of the parties, plaintiff and defendant are former household members and, as such, plaintiff is entitled to relief under the PDVA.

We now turn to defendant's challenge of the second element required to obtain an FRO, proof by a preponderance of the evidence that a predicate act was committed. See Silver, 387 N.J. Super. at 125. The judge found plaintiff proved by a preponderance of the evidence that defendant committed the act of harassment, N.J.S.A. 2C:33-4(a), by virtue of the verbal threats made at the September 29, 2018 meeting at J.S.'s psychiatrist's office, and at the October 1, 2018 encounter on the front steps of defendant's Morristown home.

"[A] person commits [the] petty disorderly persons offense" of harassment under subsection (a) of the statute if he or she "makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm." N.J.S.A. 2C:33-4(a). The three elements necessary to establish harassment proscribed by N.J.S.A. 2C:33-4(a) are:

> (1) defendant made or caused to be made a communication; (2) defendant's purpose in making or causing the communication to be made was to harass another person; and (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.
>
> [State v. Hoffman, 149 N.J. 564, 576 (1997).]

Indeed, "subsection (a) proscribes a single act of communicative conduct when its purpose is to harass." Id. at 580 (citing N.J.S.A. 2C:33-4(a)). "A finding of a purpose to harass may be inferred from the evidence presented" as well as from "[c]ommon sense and experience." Id. at 577. To cause annoyance under subsection(a) "means to disturb, irritate, or bother." Id. at 580

Contrary to defendant's contentions, our review of the record reveals a substantial evidentiary basis to support the judge's comprehensive factual findings and legal conclusions that plaintiff proved the predicate act of harassment as alleged in his complaint by a preponderance of the evidence. The judge found plaintiff's testimony more credible than that of defendant, who acknowledged the statements but disputed the context. The judge also considered but rejected defendant's "ulterior motive" defense that the FRO was an attempt to suppress his whistleblowing claims and related wrongful termination and workplace injury lawsuits.

In determining whether defendant had a purpose to harass and whether defendant's conduct was likely to cause the requisite annoyance or alarm, the judge properly considered "defendant's past conduct toward the victim and the relationship's history" and examined the September 29 and October 1 incidents "in light of the totality of the circumstances." Id. at 585. "Indeed, courts are required to consider '[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse' when determining whether the [PDVA] has been violated." Ibid. (first and second alterations in original) (quoting N.J.S.A. 2C:25-29(a)(1)).

Next, we consider defendant's challenge to the third element required to obtain an FRO, proof that a restraining order is necessary to protect plaintiff from an immediate danger or to prevent further abuse. See Silver, 387 N.J. Super. at 127. This inquiry "begins after the plaintiff has established, by a preponderance of the evidence, the commission of one of the enumerated predicate acts 'upon a person protected under [the PDVA.]'" Ibid. (quoting N.J.S.A. 2C:25-19(a)). "[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in [N.J.S.A. 2C:25-29(a)(1) to -29(a)(6)], to protect the victim from an immediate danger or to prevent further abuse." Ibid.

The statutory factors include, but are "not be limited to"

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1) to -29(a)(6).]

Applying these principles, the judge made specific findings that based on plaintiff's credible testimony expressing fear for his safety, the prior incidents of domestic violence in June and July 2018, and the undisputed evidence of defendant's military training and access to weapons, a restraining order was necessary to protect plaintiff from an immediate danger. We are satisfied the judge's findings are supported by and consistent with the competent, relevant and reasonably credible evidence in the record.

24

We address defendant's remaining arguments in the aggregate, as we are satisfied they are either baseless, belied by the record or lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(A) and (E).  In particular, we are satisfied defendant was afforded ample due process when the judge provided an orientation to all parties, including defendant, explaining, among other things, the "ramifications [of] the entry of a[n] [FRO]," specifically explained to defendant that "there [was] no right to counsel in these proceedings," and granted defendant two adjournments for defendant to seek counsel or prepare his response.  See D.N. v. K.M., 216 N.J. 587, 588 (2014) ("The [PDVA] . . . does not authorize appointment of counsel for the parties in a domestic violence action."); J.D., 207 N.J. at 481 ("Many litigants who come before our courts in domestic violence proceedings are unrepresented by counsel; many are unfamiliar with the courts and with their rights.").

Likewise, we reject defendant's contention that plaintiff introducing a new claim of violence or changing the financial abuse claim from that alleged in the complaint deprived him of due process.  Plaintiff's testimony that defendant "weaponized" J.S. to commit violence against him was limited and directly related to the predicate acts, and his testimony regarding the circumstances under which he purchased the property explained the financial abuse allegation

A-1548-18T2

contained in the complaint. While "due process forbids the trial court 'to convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint,'" id. at 478 (quoting H.E.S. v. J.C.S., 175 N.J. 309, 322 (2003)), that did not occur here. Moreover, defendant was afforded ample opportunity to cross-examine plaintiff on his testimony, and to present witnesses and evidence to dispute plaintiff's account.[10] See Peterson v. Peterson, 374 N.J. Super. 116, 124-26 (App. Div. 2005) (holding that denying defendant the opportunity to cross-examine witnesses or to present witnesses violates due process).

Equally unavailing is defendant's claim that the judge disregarded the impact of defendant's alleged brain injury on his ability to proceed at the hearing, thereby depriving him of due process. On the contrary, during the hearing, when defendant indicated he wanted to make the judge "aware" of "symptoms" he was "feeling" from the "brain injury" he suffered "while in [plaintiff's] employ," the

---

[10] We also reject out of hand defendant's assertions that the judge erred in not adjourning the proceedings sua sponte and requiring the production of recordings of interactions between the parties referenced during their testimony, or the production of J.S. and his psychiatrist to testify as witnesses. The judge required neither to determine that the legal requirements for the issuance of an FRO were met. See J.D., 207 N.J. at 482 (acknowledging that while trial courts have the "means to control testimony or . . . require that parties present testimony and evidence relevant to the issues in dispute," trial courts are not "prisoners of the whims of litigants locked in domestic warfare.").

judge responded "no one [was] accusing [him] of making it up" but the judge "ha[d not] seen anything that would indicate that [defendant] [was] unable . . . to provide [his] own defense or . . . to adequately address what[ has] been going on so far."

In relation to domestic violence proceedings, our Supreme Court acknowledged that trial courts have the "obligation . . . to see to it that justice is accomplished and to conduct and control proceedings in a manner that will best serve that goal." J.D., 207 N.J. at 482. Defendant's arguments notwithstanding, we are satisfied that in this case, the judge accomplished that goal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1548-18T2